## DACKMAN v. DACKMAN

[No. 48, September Term, 1968.]

*Decided February 7, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*H. Enslie Parks,* with whom were *Parks and Parks* on the brief, for appellant.

*Richard R. Beauchemin,* with whom were *Arnold, Beauchemin & Dilli* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

When the bonds of matrimony which have endured for years are severed unilaterally by the husband when he becomes infatuated with another female, the indignity his spouse feels has been heaped upon her often may result in her determination to acquire from him financial support, the adequacy of which she measures by that indignity and, if he seeks a divorce to legitimatize his amour, the measure is weighted by her righteous duty to exact the toll that public morality demands. In such cases the price of the right to remarry may become so high that the husband may take counter measures reflecting the philosophy that the best defense is a strong offense.

In this context we approach the problems of the appeal before us.

The appellant husband and the appellee wife were married in 1951 and lived together in or near Baltimore until late in 1967, when the husband went to Nevada on November 21 with his new found love, and established residence. He filed suit for divorce on January 15, 1968, some eight weeks after he arrived, and on February 14 next was granted a divorce, and promptly married his paramour. The wife did not submit to the jurisdiction of the Nevada courts and was not summoned in Nevada.

On December 21, 1967, while the husband was establishing his Nevada domicile, the wife filed a suit in the Circuit Court No. 2 of Baltimore City seeking permanent alimony on the basis of his adultery, and custody of and support for the four children of the couple. She also filed a petition for an ex parte injunction against the husband and various other persons and corporations to prevent him from disposing of or removing from the State his considerable assets, which the court issued, and a petition praying that a designated resident of Nevada be authorized to serve upon the husband personally the subpoena of the Circuit Court No. 2, requiring him to answer the bill for alimony and to serve upon him personally also the petition for the ex parte injunction and the order of court thereon, and an

order nisi for alimony pendente lite which the court had signed.[1]

The husband was personally served in Nevada on December 26, 1967, but not by the individual designated in the order. Thereafter, the husband filed a motion to dismiss the proceedings because the court had no jurisdiction over the person of the husband, and the wife filed a petition alleging the adultery of the husband, his intention to establish a false domicile in Nevada, that he is still a resident of Maryland, that all his property and business are here, that he owns property valued at $250,000, including some 80 rental properties in Baltimore and Baltimore County, and prayed that a trustee be appointed to take possession of and manage all of her husband's property within the jurisdiction of the court and pay her $250 a week for her support and maintenance and that of the children.

The record before Judge Wolf on the motion to dismiss, including the wife's testimony, shows that the husband was living in Maryland when he married in 1951 and continued to live here with his wife until 1967. He is a member of the Maryland Bar and a current contributor to the Clients' Security Trust Fund; he had two offices in Baltimore and was Chairman of the Board and a very large stockholder of National City Bank, the principal office of which is in Baltimore. Soon after he went to Nevada, he resigned as an officer of the Bank and has sold most, if not all, of his stock. He is an officer, director and stockholder of other financial and real estate corporations. He had attempted to have his wife agree to his changing marital partners and when she refused immediately left for Reno, from whence he called her twice in the week after his arrival—the first time again to ask for a divorce and the second to say that if she would write him saying she would agree to a divorce he would return to Baltimore. He has continuously remained in Nevada since the divorce. The record also shows that there was admitted in evidence at the instance of the wife the record

1. The court issued an order of alimony pendente lite of $250 a week but later vacated the order and no such alimony was ever paid (the Nevada decree ordered the husband to pay $125 a month for each child and he has made the payments). The injunction was later modified to a mutually satisfactory form by agreement of the parties.

of the findings of fact and conclusions of law of the Second Judicial District Court of the State of Nevada in and for the County of Washoe which granted the husband an absolute divorce in his suit against the wife. The findings of fact were:

> "That the Plaintiff for a period of more than six (6) weeks immediately before the filing of this suit, with the bona fide intent to make Nevada his home for an indefinite period of time, has resided and been physically present and domiciled in the State of Nevada, and now so resides and is so domiciled therein; that all of the allegations contained in Plaintiff's Complaint are true."

The conclusions of law were that "the Court has jurisdiction of the Plaintiff and Defendant and of the subject matter herein, and the Plaintiff is entitled to an absolute and final Decree of Divorce * * *."

Judge Wolf held that the husband was a domiciliary of Maryland at the time he was served on December 26, 1967, and that therefore was subject to the "long arm" provision of Code (1965 Repl. Vol.), Art. 75, § 95, under the subtitle "Bases of Personal Jurisdiction over Persons outside this State" ("A court may exercise personal jurisdiction over a person domiciled in * * * this State as to any cause of action").

Judge Wolf held further that although the court had personal jurisdiction over the husband it could not grant interlocutory injunctive relief under Maryland Rule BB71 c under the subtitle "Injunction" because that rule provides under the heading "Domestic Relations" that "an injunction in an action for divorce, alimony, support of wife or child, custody of child or annulment of marriage, shall not be governed by this subtitle." He held, however, that Code (1966 Repl. Vol.), Art. 16, § 4, authorized the court "to seize the property of a nonresident defendant *pursuant to a bill of complaint* for permanent alimony * * * [and this while the husband] is a domiciliary of this State, he is temporarily a nonresident and as such falls within the provisions of this Section." [2] (Italics supplied)

---

**2.** It should be noted that § 4 of Art. 16 of the Code does not say precisely what Judge Wolf said it said, since it reads:

"In *any decree for divorce* against a nonresident, where

The court's order dated March 11, 1968, was that "the Respondent's Motion to Dismiss of February 8, 1968, be and hereby is overruled." The husband entered an appeal "from the Decree dated March 11, 1968."

We held in *Eisel v. Howell*, 220 Md. 584, 586, that:

> "The denial of a challenge to the jurisdiction does not settle or conclude the rights of any party or deny him the means of proceeding further. It settles nothing finally. An order which does none of these things is not appealable."

This holding was followed in *Milio v. Bar Association*, 227 Md. 527, 530, and see *Middleman v. Md. Nat. Comm.*, 232 Md. 285, 289, and *Lawrence v. Dep't of Health*, 247 Md. 367, 371. We have concluded, however, that the substantial merits of the matter before us will not be furthered or determined unless the case is remanded under Maryland Rule 871 a without affirmance, reversal or modification, and that the purposes of justice will be advanced by permitting further proceedings in the cause.

The Nevada divorce decree is entitled to and must be given presumptive validity and full faith and credit in Maryland unless and until it is judicially impeached by proof that the husband did not acquire a valid domicile in Nevada as the court of that State held that he had. *Brewster v. Brewster*, 204 Md. 501, 504-505; *Colby v. Colby*, 217 Md. 35, *cert. denied sub nom. Appleby v. Colby*, 358 U. S. 838; *Day v. Day*, 237 Md. 229; *Staley v. Staley*, 251 Md. 701. The court below did not expressly find the Nevada divorce invalid and if it be argued that it necessarily did so inferentially, the answer is that the record does not support a finding of invalidity, and until invalidity is judicially determined the finding of fact of the Nevada court that the husband had been domiciled in Nevada for at least six weeks prior to January 15, 1968—that is, from at least

alimony is prayed in the bill of complaint, and the same sets forth that the nonresident defendant is possessed of property in the State, the court shall have full authority to award alimony, and any property in the State of any person against whom alimony may be so awarded shall be liable for the same and subject to such decree as the court may pass in the premises * * *." (Italics supplied)

December 4, 1967—stands unimpeached. The wife's bill was not filed until December 21, 1967 and service on the husband was not had until five days later. The applicability of § 95 of Art. 75 of the Code turns on the fact of Maryland domicile of the one to be served in another State, and that section cannot be used as a basis of personal jurisdiction if the defendant was not a domiciliary of Maryland when suit was filed against him and when he was served.

In *Naylor v. Naylor,* 217 Md. 615, 624, in which a Nevada divorce decree was held invalid because there was no actual domicile in Nevada, we pointed out some of the tests the courts have used to determine the genuineness of domicile in a sister State. There the Maryland deserter had remained in Nevada for most of two years. We said:

> "An examination of the relatively few cases in recent years which have sustained the bona fide character of the domicile in another state reveals that one or all of several other factors were present, such as: (i) residence in the divorce-granting state for a substantial period before the divorce action was instituted; (ii) the removal of all or substantially all of one's personal property to the new residence; (iii) the severance of all or most of one's connections in the state departed from; (iv) the engagement in permanent business activities or gainful employment; and (v) the purchase or renting of a permanent home or other substantial place of abode."

In the present case the husband not only has remained in Nevada some fourteen months but has apparently severed his Maryland business and social connections. It was not shown what personal property he has taken to Nevada, whether he is permanently engaged in business there or not, or whether he has purchased or rented a permanent home there.

For the wife to invalidate the Nevada divorce she must offer more persuasive evidence of Nevada non-domicile than she has yet produced.

We come to the matter of the applicability of § 4 of Art. 16 of the Code, or a variant thereof governed by the same ra-

·tionale. As the Maryland law has stood heretofore, the unimpeached Nevada decree granting an absolute and final divorce to the husband would deprive the courts of this State of power to award the wife monetary support for herself. In *Johnson v. Johnson,* 199 Md. 329, the wife appeared in a Florida court which was entertaining her husband's suit for divorce. The Court said:

> "the question usually raised in tourist divorce cases, as to the domicile of the plaintiff, apparently was not raised in this Florida case. It would be futile to raise it now, plaintiff having appeared in the Florida case.
>
> \* \* \*
>
> "we now face the question whether, under Maryland law, the Maryland court is authorized to exercise jurisdiction \* \* \*.
>
> "The answer is, no. The authorities are in conflict in different jurisdictions. *Staub v. Staub,* 170 Md. 202, 204-212, 183 A. 605. In Maryland the court has no authority to make, change or enforce provision for payment by a former husband to his former wife of .alimony (except power reserved, expressly or by implication, to modify provision for alimony in a decree for divorce a vinculo) or 'suit money.' *Tabeling v. Tabeling,* 157 Md. 429, 146 A. 389; *Staub v. Staub, supra; Tome v. Tome,* 180 Md. 31, 22 A. 2d 549. It is immaterial whether the marriage relation was terminated by death, *McCurley v. McCurley,* 60 Md. 185, by a Maryland divorce, *Tabeling v. Tabeling, Tome v. Tome,* or by a divorce in another state, *Staub v. Staub.* It is likewise immaterial to distinguish on the facts the instant case from the cases just cited or from any cases which have arisen under the full faith and credit clause. The question is not a constitutional question, but a question of Maryland law. If Maryland is to enter into competition with other states to occupy as much 'divisible divorce' jurisdiction as possible under *Estin v. Estin,* 334 U. S. 541, 68 S. Ct. 1213, 92 L. Ed. 1561, the Maryland legislature must first change the Maryland law, so that power to make and change

maintenance and expense allowances shall survive divorce. * * *

".\s we have said, the authorities in different jurisdictions are in conflict as to whether power to award alimony or suit money may survive the dissolution of the marriage relation." [199 Md. at 336-339]

*Tabeling* held that a wife divorced absolutely by a Maryland Court could not be allowed alimony or counsel fees because

"When the petition * * * was filed, the appellee was not the wife of the appellant, and as alimony *pendente lite* and counsel fees are allowable only to a wife, because of the relationship of husband and wife, one who is not a wife is not entitled to such allowance." [157 Md. at 429, 437]

In *Staub* the Court equated alimony allowed by the statute in cases of absolute divorce—then § 15, now § 3 of Art. 16 of the Code—with ecclesiastical alimony allowable only in cases of partial divorce under which the marital status stood and which is statutorily provided for in Maryland by then § 14, now § 2 of Art. 16 of the Code, and said:

"Moreover, under the reasoning of this court in the cases of *Emerson v. Emerson, Tabeling v. Tabeling,* and *Marshall v. Marshall, supra,* and authorities cited therein, we are unable to conclude that the right to maintain a proceeding for alimony may survive the dissolution of the marriage relation, since alimony is founded upon the common law obligation of a husband to support his wife, which, in the absence of some saving statute, must necessarily end by the passage of a decree effectively dissolving the marriage tie, and it seems to us that the cases in other jurisdictions adopting this view are fortified by justice and reason." [170 Md. 202, 212]

Not long after the decision of *Johnson* in 1952 came indications that the rule of that case and of *Tabeling* and *Staub* in their holdings that statutory alimony was the same in cases

of absolute divorce as in cases of partial divorce was not sacrosanct. The Johnsons engaged in further litigation when he filed a petition to obtain release of certain of his stock which was held by the clerk of the court to secure payment of alimony ordered by the Maryland Court prior to the Florida divorce decree. On the strength of the first Johnson case, this Court reversed the chancellor and ordered the stock released. *Johnson v. Johnson,* 202 Md. 547. Chief Judge Sobeloff and Judge Hammond concurred in the result, in an opinion by the latter, not because they thought it "right or desirable but rather because it was indicated by a decent respect for the rule of *stare decisis* and compelled by obedience to the principle of *res judicata."* The concurring opinion pointed out the unrealistic concept of alimony in the earlier cases, saying:

> "In some States the Courts have refused to penalize their citizens by blind adherence to an illogical theory. In these jurisdictions, the Courts hold that if another State has granted an *ex parte* divorce, the obligation of support for the wife which has been recognized by the Court of the home State will not be affected. The divorce is divisible in that it is valid as a dissolution of the marital bonds but unavailing to relieve the husband of his duty of support. *Estin v. Estin,* 296 N.Y. 308, 73 N.E.2d 113, affd. 334 U. S. 541, 68 S. Ct. 1213, 92 L. Ed. 1561 * * *.

> "Under the reasoning and holding of *Staub v. Staub,* 170 Md. 202, 183 A. 605, if Mrs. Johnson had ignored the Florida divorce proceedings and the divorce had been granted *ex parte,* Maryland would have no jurisdiction to give or continue alimony. In these days of Nevada, Florida, Arkansas, and other prolific divorce States, this puts a separated wife in a real predicament. She is on the horns of a dilemma, having the alternative of submitting to the jurisdiction of a foreign Court, where as an out-of-state defendant, she is under a disadvantage in seeking alimony, or of ignoring the foreign divorce proceeding and losing the alimony granted by her home Court entirely. Under the mores and practices of the times, it is hardly fair

for Maryland to put its lady citizens in this predicament because of a narrow, artificial and unrealistic concept and judicial interpretation of alimony.

"I say narrow, artificial and unrealistic for this reason. Divorce was unknown under the common law, and is of statutory creation in Maryland. Limited divorces with alimony were granted in England by the Ecclesiastical Courts. Here the Legislature at first granted divorces but the Courts of Chancery assumed jurisdiction of alimony. By what is now Section 14 of Article 16 of the Code, passed in 1777, Courts of equity were expressly given alimony jurisdiction. The Act provided: 'The Courts of equity of this State shall and may hear and determine all causes for alimony, in as full and ample manner as such causes could be heard and determined by the laws of England in the Ecclesiastical Courts there.' Alimony as known to the Ecclesiastical Courts was support granted where there was a divorce *a mensa*. In 1841, by what is now Section 15 of Article 16 of the Code, the Legislature provided that in *all* cases where divorces were granted, alimony may be awarded. There is no definition of alimony in the Statutes, and, since the Act of 1841, in exercising the jurisdiction granted by that Act, the Courts have modelled the support awarded in divorces *a vinculo* in the image of alimony as it had been known to the Eccesiastical Courts. It is immediately apparent that the judicial concept of alimony as authorized by the Act of 1841 was illogical because under the ecclesiastical law, alimony is support of the wife by the husband as long as they are both living and are married to each other. The limited divorce granted by the Ecclesiastical Courts was nothing more than a legally authorized separation and did not destroy the status of husband and wife; therefore, it was entirely consistent and logical that the husband be required to support the wife even though they were living apart. Since the divorce *a vinculo* severs the matrimonial status, alimony in the traditional sense cannot rationally be compelled after an absolute divorce.

"In reality, the alimony permitted by Section 15 of Article 16 of the Code is a legislative permission for the Court to require a *former* husband to pay support to his *former* wife. * * * What I am saying is that there is no magic in the word 'alimony' and the decisions which originally construed Section 15 of Article 16 might well have held that the Courts had jurisdiction to award support to a former wife at any time it felt that the interests of justice and the parties required it.

"The decisions show that the support awarded. in an absolute divorce is not historical alimony and show the incongruous results which have flowed from the attempts to work with it as if it were.

* * *

"In *Marshall v. Marshall,* 162 Md. 116, 159 A. 260, 83 A.L.R. 1237, the Court said that unless an *a vinculo* decree either awards alimony, or preserves jurisdiction, the Court is powerless, after the decree has become enrolled, to· award alimony. Under this decision, if the Court awarded alimony of one cent a year, it could at any time, years later perhaps, require the husband if his circumstances warranted it, to pay ten thousand dollars a year. Also, by adding four words —'The Court retains jurisdiction'—alimony could be given for the first time twenty years after the decree.

"Clearly, if what the Legislature authorized were other than support for a former wife, no increase or commencement of 'alimony' could be given years after a couple ceased to be man and wife merely because at the· time of the divorce, some amount was awarded or four words were added to a decree.

* * *

"There has been recent evidence that in both popular and ·legal thinking, technical distinctions between support and alimony are being eliminated. So that a Court could imprison for· failure to pay support, as well as alimony, the Legislature and the people of Maryland, in 1950, amended Section 38 of Article 3

of the Constitution to provide that: '* * * a valid decree of a court of competent jurisdiction or agreement approved by decree of said court for the support of a wife or dependent children, or for alimony, shall not constitute a debt * * *.' This is certainly evidence from a fundamental source that support and alimony are, in substance, identical. See also the Uniform Reciprocal Enforcement of Support Act—Article 89C of the Code, first passed by the Maryland Legislature in 1950." [202 Md. at 556-561]

In *Clayton v. Clayton,* 231 Md. 74, Judge Henderson, for an unanimous Court, held that where a divorce was granted for a cause which made the marriage void *ab initio* so that the couple had never legally been husband and wife, alimony nevertheless could be granted under the authority of § 3 of Art. 16 of the Code, which provides that whenever a divorce is granted, alimony may be allowed. He said:

"The key to the instant case, as we see it, is the legislative declaration that alimony is allowable whenever there is a decree for divorce. We read 'alimony' not in the technical sense of the word, but as commensurate with 'support'. The inclusion of prevenient invalidity as a ground for divorce must be ascribed some meaning, and we think it shows a legislative intent to permit an award of alimony in a proper case. The writers and cases recognize that the problem is one of statutory construction. In the absence of statute, alimony is generally not allowed in any case where the marriage is declared to be null and void ab initio. See 17 Am. Jur. *Divorce and Separation,* § 562; Nelson, *Divorce and Annulment,* (2d ed.) § 31.56. The cases are collected in a note 54 A.L.R. 2d 1410. But by statute in many states, support for the putative wife is allowed in all cases of divorce or annulment. In other states, the same result is reached, by construction of the divorce statutes to permit an award of alimony, even where the ground of divorce is that the marriage is a nullity. See *Jones v. Jones,* 296 P. 2d

1010 (Wash.) and *Eggleston v. Eggleston,* 103 N.E. 2d 395 (Ohio). We take the same view. If other questions relating to voidable marriages and annulments are left unanswered, that is a matter for legislative consideration, as suggested by Professor Strahorn in the articles cited, *supra,* and by Judge Hammond in his concurring opinion in *Johnson v. Johnson, supra.* [231 Md. at pp. 77-78]

After the decisions in the *Johnson* cases, the Supreme Court decided *Vanderbilt v. Vanderbilt,* 354 U. S. 416, 1 L.Ed.2d 1456, in which the husband obtained an *ex parte* Nevada decree in June 1953 and the wife instituted action in New York, the State of her domicile, for separation from the husband and alimony. The New York court sequestered his property. The Supreme Court followed *Estin v. Estin,* 334 U. S. 541, 92 L. Ed. 1561, and held that "[s]ince the wife was not subject to its jurisdiction, the Nevada divorce court had no power to extinguish any right which she had under the law of New York to financial support from her husband." [354 U. S. 418] See also *Simons v. Miami Beach Nat. Bank,* 381 U. S. 81, 87; 14 L.Ed.2d 232.

The concurring opinion in the second *Johnson* case said:
"The unfortunate distinctions in the results of the cases which have been produced by the restricted concept of alimony where there is an absolute divorce, are not likely to be cured by judicial decision for the reasons which prompted me to concur in this appeal. It is best, perhaps, if they are not. If a change is to be made in the established law, it would seem appropriate that the legislature make it." [202 Md. at 561]

The Legislature has not seen fit to respond to the suggestions in the concurring opinion in the second *Johnson* case or to those in *Clayton* and we now take the view that the rule of the *Johnson* cases restating the earlier cases should be reexamined and relaxed, since in *Clayton* we did change the established concept of alimony in cases of absolute divorce by reading "alimony" in § 3 of Art. 16 of the Code as commensurate

with "support" and allowable where there never was the legal relation of husband and wife and thereby changed the concept of statutory alimony which underlay the rule of the *Johnson* cases and the earlier cases on which they relied.

The wife here has not sought a divorce and, as long as the Nevada decree stands unimpeached, could not obtain one as such in Maryland. But a court of equity has inherent power, independent of its authority to grant a divorce, to entertain and grant an application by a wife against her husband for alimony where he is at fault. *Taylor v. Taylor*, 108 Md. 129; *Woodcock v. Woodcock*, 169 Md. 40; *Walker v. Walker*, 125 Md. 649; *Wathen v. Wathen*, 245 Md. 684, 686. Section 2 of Art. 16 of the Code, enacted in 1777, declares this inherent power. Where the court cannot obtain jurisdiction in personam over the husband it may award support, if the wife proves misconduct or behavior which would justify granting her a divorce, payable from property of the husband within the court's jurisdiction. *Commonwealth of Penna. v. Warren*, 204 Md. 467. There the Court said:

> "For over one hundred years equity has asserted jurisdiction over the maintenance, support and education of infants in those situations where the father had no means or was an improper person to care for the child and the infant had property of his own. *Story's Equity Jurisprudence*, 14th Ed., Sec. 1763. Similarly, early in the history of equity jurisprudence, courts of equity would, if a wife had any equitable property within the court's jurisdiction, decree the wife a suitable maintenance out of such funds in case of the husband's inability or refusal to maintain her. Of course, this particular jurisdiction of equity was rendered largely obsolete by the adoption of statutes abolishing the common law interest of the husband in the estate of his wife. *Story's Equity Jurisprudence*, Sec. 1859; *Pomeroy's Equity Jurisprudence*, 5th Ed., Secs. 1114, 1119.
>
> "The power to award separate maintenance has long been recognized in Maryland when cause for divorce is shown. In *Helms v. Franciscus*, 2 Bland, Chancery

544 (1830), it was stated that the High Court of Chancery always had, even under the Provincial Government, entire jurisdiction of such cases of claims for alimony, or for separate maintenance out of the husband's estate, founded on his misconduct, and that the statute of 1777, conferring upon courts of equity the jurisdiction over alimony traditionally exercised by the Ecclesiastical Courts of England made no change in the law. Indeed, as early as 1727, the chancellor, upon a suit brought by a wife against her husband for support and maintenance, awarded the following decree: 'That the defendant pay to the complainant ten pounds per annum by four quarterly payments; and it is also decreed, that he provide her a house, and that the defendant pay unto the said complainant, all her costs and charges by her in the said cause laid out and expended.' *Codd v. Codd,* reported in footnote in *Hewett v. Hewett,* 1 Bland, Chancery 100, note (b). In many states there are statutes which authorize suits for separate maintenance. *Ann. Cas.* 1913D, note, page 1132-1143." [204 Md. 472-473]

The inherent right and power of a court of equity to require the sequestration or attachment of property of a nonresident husband within its jurisdiction as a source of support and maintenance to a legally and factually deserving wife and to award her that support and maintenance from the property is analogous to the statutory right of the court under § 4 of Art. 16 of the Code to act similarly in cases of divorce.

It would seem particularly appropriate for a Maryland equity court to exercise that inherent power in a case in which the marital domicile was in Maryland for many years, the deserted wife continues to reside here, the adultery which is the fault which justifies support and maintenance—assuming it is proven that it occurred—took place in Maryland, there is ample property in Maryland to furnish the support, and the foreign divorce was granted without the wife being personally before the court. Under these circumstances, and we at this time limit our decision and holding to the particular facts of the case before

us, we would affirm a suitable decree granting the wife support payable only from the property of her husband in Maryland if the wife cannot or does not choose to impeach the Nevada decree and the trial judge finds it factually appropriate to grant such a decree.

> *Case remanded without affirmance or reversal for further proceedings conforming to the opinion herein, costs to be paid by appellant.*