ROSA  MARIA  KAPNECK  *v.*  PHILIP  R.  KAPNECK

[No. 836, September Term, 1975.]

*Decided May 6, 1976.*

The cause was argued before ORTH, C. J., and MENCHINE and MASON, JJ.

# 411

*Ferdinand J. Mack,* with whom were *Shadoan & Mack* on the brief, for appellant.

*James J. Cromwell,* with whom were *Clark & Cromwell, P.A.* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

This appeal calls for us to examine the authority of a court of equity to grant injunctive relief with respect to its jurisdiction as to divorce and alimony [1] and custody and support of a child.[2] The examination is to be made in the light of Maryland Rule BB 71, § c and a mandate of Courts Art. § 3-603 (a). Rule BB 71, § c reads: "An injunction in an action for divorce, alimony, support of wife [3] or child, custody of child or annulment of marriage shall not be governed by this Subtitle." [4] The statutory mandate referred to declares: "The court shall hear and determine a case of alimony in as full and ample manner as such case could be heard and determined by the Ecclesiastical Courts of England."

On 11 June 1975 the Circuit Court for Montgomery County, sitting as a court of equity, issued an *ex parte* pendente lite injunction in an action pending before it whereby Rosa Maria Kapneck (Wife) sought a decree of

---

1. Courts Art. § 3-603 (a) provides: "A court of equity has jurisdiction in an action for divorce, alimony, or annulment of marriage."

2. Courts Art. § 3-602 (a) provides: "A court of equity has jurisdiction over the custody, guardianship, legitimation, maintenance, visitation and support of a child." "Legitimation" and "visitation" were inserted by Acts 1975, ch. 317, effective 1 July 1975.

3. Code, Art. 16, § 3 provides: "In cases where a divorce is decreed, alimony may be awarded to either spouse." The phrase "to either spouse" was added by Acts 1975, ch. 332, effective 1 July 1975. "Alimony" as used in the section is commensurate with "support". Dackman v. Dackman, 252 Md. 331 (1969); Colburn v. Colburn, 15 Md. App. 503 (1972). See LaChance v. LaChance, 28 Md. App. 571 (1975).

4. The BB Subtitle bears the heading: "Injunction". Rule BB 71, § a states: "This Subtitle shall apply when an injunction is sought in equity or pursuant to Subtitle BF (Mandamus and Injunction as Ancillary Relief in an Action at Law), subject to sections b and c of this Rule." Section b concerns labor disputes. Section c, set out above, concerns domestic relations.

divorce from Philip R. Kapneck (Husband), alimony, custody and support of minor children, counsel fees and suit money.[5]

On 11 June 1975 Wife filed a verified motion for an order enjoining Husband "from harassing [Wife] and the minor children of the parties. . . ." See Rule 370, § a 4. The motion set out in detail grounds for the requested order. It was asserted that the house in which the parties lived, and all personal property therein except Husband's clothing and personal effects were the property of Wife.[6] The same day the chancellor "upon consideration of the verified motion of [Wife], Exhibits 1-6[7] and the points and authorities in support thereof, and the record herein," issued an *ex parte* pendente lite injunction. Husband was enjoined from entering the home without written permission of Wife, from conversing with her by telephone, from threatening her, from touching or assaulting her, and from communicating with her concerning the divorce action except through his attorney. Husband could move for a modification of the order on 10 days notice. On 24 June, Husband moved to vacate and dissolve the injunction and Wife promptly opposed that motion. The chancellor granted Husband's motion:

> "Upon consideration of the Motion of [Husband] to
> Vacate and Dissolve *Ex Parte Pendente Lite*

---

5. The Bill of Complaint was filed by Wife on 2 June 1975 and docketed as Equity No. 52566. It contained what was designated as "Count One" and "Count Two". But see Maryland Rule 370, § a 1. The prayers for relief, Rule 370, § a 3, under Count One were for a decree of divorce *a vinculo matrimonii*, for the care and custody, pendente lite and permanently, of the four minor children of the couple, for alimony pendente lite and permanently, for support and maintenance for the minor children, pendente lite and permanently, for counsel fees and suit money, and that Wife be awarded "such other and further relief as to the Court may seem meet and proper and the exigencies of the case may require." The prayers for relief under Count Two were the same except that a decree of divorce *a mensa et thoro* was sought.

6. There were allegations in the Motion that in 1974 Wife had sued Husband for divorce *a vinculo matrimonii* based upon adultery but forgave him, dismissed the action and reconciled with him upon execution of an agreement. The agreement was appended to the Motion as Exhibit No. 6. Among other things, Husband agreed to convey the jointly owned home and contents to Wife.

7. Exhibits 1-5 were photographs of the physical damage Husband had allegedly done to the house.

Injunction issued by this Court on June 11, 1975, and the Points and Authorities in support thereof, it is, by the Circuit Court for Montgomery County, Maryland, Sitting as a Court of Equity, this 11th day of July, 1975,

ORDERED, that the operation of the *Ex Parte Pendente Lite* Injunction dated June 11, 1975, be and the same is hereby dissolved and vacated."

On 6 August 1975 Wife noted an appeal from the order of 11 July 1975. Courts Art. § 12-303 (c) (1).[8]

Although "the Inhabitants of Maryland are entitled to the Common Law of England," [9] the law of divorce did not come here by that means, because it had no common law foundation. W. T. Nelson, in his historical research for the original edition of his work on divorce and annulment, found that "save for the reign of Henry VIII, the church, in England, from a very remote period extending perhaps even before the reign of Edward the Confessor, kept a close watch upon matrimonial affairs upon the theory that marriage was a sacrament and that it had general control of all things pertaining to the good of the soul. To such extent as the ecclesiastical courts would grant any relief, they followed their conscience and religious tenets rather than precedents. They kept records only as they saw fit, and their decisions were rarely reported." 1 W. T. Nelson, *Divorce and Annulment* (2nd ed., 1945) § 1.01, n. 1, hereinafter cited as *Nelson*. The courts of common law and chancery saw fit to permit this situation to continue. "Not until 1809 was anything resembling a modern 'divorce court,' with decisions fairly consistently reported, set up in England; and that was still not a court of law or chancery, but one of the

---

**8.** In the interim, Husband answered Wife's Bill of Complaint and filed a Counter-Bill seeking a divorce *a vinculo matrimonii,* a divorce *a mensa et thoro,* custody of the children, a recision of the reconcilation agreement and restoration of the property conveyed by him to Wife. Wife answered the Counter-Bill. The present status of the divorce actions is not shown in the record before us. Upon joint motion of Wife and Husband the court below ordered the Clerk of that court to transmit to the Court of Special Appeals certified copies of the original papers. Rule 1026, § d.

**9.** Art. 5, Declaration of Rights, Constitution of Maryland.

ecclesiastical courts specially designated for the purpose." In England "[j]urisdiction of matrimonial affairs continued to be ecclesiastical until the establishment, in 1870, of the 'probate, admiralty and divorce court,' since which time the subject has been one of lay jurisdiction and handled in a manner similar to that with which we are familiar in most states of the Union." The church did not recognize an absolute dissolution of an originally valid marriage. Thus it was that in England, and in the American colonies and early states, absolute divorces were obtainable only by act of parliament or of the legislature or equivalent legislative assembly. Church policy precluded the ecclesiastical courts from granting absolute divorces; they granted legal separations (divorces *a mensa et thoro*) and under certain circumstances declared marriages wholly void. Some of the American colonies and states, including Maryland, followed this lead.[10] "From the earliest times in this State, divorces were granted by, and emanated from, the legislature. . . ." *Courson v. Courson,* 213 Md. 183, 186 (1957). By Acts 1841, ch. 262,[11] the legislature granted jurisdiction of all divorce actions to the courts of equity of this State. "It was thereafter held that these enactments did not preclude the legislature from granting divorces, *Wright v. Wright,* 2 Md. 429, 450, but by Sec. 33 of Art. 3 of the Maryland Constitution, the legislature is now prohibited from so doing." [12] *Id.*

Unlike the granting of an absolute divorce, power to grant alimony has always been regarded as judicial, not legislative. "[A]n attempt by the legislature to grant alimony was held to be a judicial function and therefore unconstitutional. *Crane v. Meginnis,* 1 Gill & J. 463, 474 [1829]." *Courson v. Courson, supra,* at 186. "Hence, though determination of such matters [as compulsory support and

---

10. The preceding quotations and historical summary are from *Nelson,* § 1.01.

11. Now Courts Art. § 3-603 (a). See note 1 *supra.*

12. Section 33, Art. 3, Constitution of Maryland, provides *inter alia:* "The General Assembly shall not pass local, or special Laws, in any of the following enumerated cases, viz: . . . granting divorces. . . ."

the settlement of property rights between husband and wife] is now commonly incident to divorce proceedings, adjudications with respect thereto are ordinary functioning of the courts for which there is no difficulty in finding a proper historical and common-law background." *Nelson,* § 1.01. "So, at the present time and for many years past in Maryland, the jurisdiction to hear and determine questions of divorces and alimony, both temporary and permanent, is, and has been, vested in the courts of equity in this State." *Courson v. Courson, supra,* at 186.[13]

As we have seen, the General Assembly declared in 1841 that jurisdiction of an action for divorce, alimony, or annulment of marriage was in a court of equity and the statute has survived as Courts Art. § 3-603 (a). The Court of Appeals said in *Murray v. Murray,* 134 Md. 653, 657 (1919): "It is by statute that the jurisdiction exercised by the courts of equity in this State, in divorce cases, is conferred upon them; which statute likewise limits and prescribes the jurisdiction so conferred." *Nelson* elaborates on this as a general proposition. "The power of the courts over divorce suits is derived entirely from the statutes, and is wholly dependent thereon. For example, only such judgments may be entered as are authorized by statute, and all the legislative requirements must be fulfilled to give the court jurisdiction. Not only must the statutes be strictly complied with, but they are also, usually, rather strictly construed." *Nelson,* § 1.02. Ordinarily, therefore, to the extent that the proceedings are governed by statutes particularly relating thereto, such statutes are controlling and whether the action is to be regarded as at law or in equity becomes immaterial. "In some states, statutes expressly classify divorce proceedings as equitable, or provide that they are to be governed by equity practice; in which event, of course, the statute is controlling, as the legislature unquestionably has power to place its own classification upon the proceedings." *Nelson,* § 1.03. Statutes in most states usually refer practice in divorce cases to equity practice or that in civil actions

---

13. For a history of alimony see Courson v. Courson, *supra,* at 185-186.

generally,[14] so that the extent to which practices of the English ecclesiastical courts might be resorted to by way of precedent is now rarely of practical interest. *Nelson*, § 1.05. Not so in Maryland, however. Courts Art. § 3-603 (a), after providing that a court of equity has jurisdiction in domestic matters, declares: "The court shall hear and determine a case of alimony in as full and ample manner as such case could be heard and determined by the Ecclesiastical Courts of England." [15] Read literally, this may be construed as applying only to alimony. The Court of Appeals, however, over a century ago, used this reference to the "Ecclesiastical Courts of England" to state that in Maryland divorce practice is founded on the practice of the ecclesiastical

---

**14.** *Nelson,* § 1.03 states, footnotes omitted:

"Divorce suits are civil proceedings, and are commonly thought of, in most states, as suits in equity. This is doubtless due to the fact that the hearings are usually relatively informal and the issues are rarely tried to a jury even in contested cases. Many decisions of courts of last resort have referred to such proceedings as equitable, or in the nature of equitable proceedings, or controlled generally by equity practice and principles. To treat a divorce suit as one in equity is historically an error, however, as a suit for absolute divorce was unknown to the common law, either in the law courts or in chancery. Such a suit is sui generis. Because of the interest of the state in the continuance and solidity of the marital relation, it may be proper to apply thereto equitable maxims, such as the 'clean hands' requirement, and to relax the practice to accord with the more liberal rules of equity proceedings and of trials generally by the court without a jury; but the better reasoned decisions indicate that, save as procedure is relaxed to this extent to afford expedition and extend the realm of permissible inquiry, a divorce proceeding is actually and properly to be classified as an action at law rather than a suit in equity. If equitable considerations are to be invoked or applied, in the absence of statute making the proceedings equitable, it should be on grounds of public policy rather than in the name of equity. On the other hand, such matters as the awarding of alimony, and determining custody of children and providing for their support, though commonly incident to a divorce suit, have a distinct origin and are properly to be regarded as independent causes of action only permissibly joined with the cause of action for divorce, usually by virtue of statute. In so far as they are concerned, courts of equity historically had jurisdiction, and the proceedings are truly equitable."

**15.** "In Maryland, there never was an *Ecclesiastical Court* . . . ." *Courson v. Courson, supra,* at 185. It was the High Court of Chancery (or the Court of Ordinary) which had, "under the Provincial Government, entire jurisdiction of claims for alimony, or separate maintenance, from the husband based on his misconduct."

courts of England. "The court in such case sits, not in the exercise of its general and ordinary equitable jurisdiction, but as a Divorce Court; and must be governed by the rules and principles established in the Ecclesiastical Courts in England, wherein a similar jurisdiction has been exercised, so far as they are consistent with the provisions of the Code. * * * In respect to the mode in which Courts of Equity shall exercise jurisdiction in divorce cases, and the principles by which they are to be governed, the Code is silent. But from the nature of the jurisdiction itself, it has always been considered that the decisions of the English Ecclesiastical Courts, in similar cases, may properly be referred to as precedents; and they have uniformly been cited and relied on as safe and authoritative guides for the courts of this State in disposing of cases of this kind." *J. G. v. H. G.*, 33 Md. 401, 406-407 (1870). By 1926 the Court of Appeals, with respect to divorce cases, found it to be "well settled by our decisions that the rules of the ecclesiastical courts of England prevail in Maryland so far as they are consistent with the Code. *Emerson v. Emerson*, 120 Md. 584." *Clarke v. Clarke*, 149 Md. 590, 592 (1926). This view was applied in resolving a question of alimony in *Winkel v. Winkel*, 178 Md. 489 (1940). The Court said, at 503: "The practice here is founded on the practice of the ecclesiastical courts of England, whence our procedure largely came. *DeBlaquiere v. DeBlaquiere*, (1830) 3 Hag. Ecc. 322, 162 Eng. Reprint, 1173; *Saunders v. Saunders*, 1 Sw. & Tr. 72, 164 Eng. Reprint, 634; *Kerr v. Kerr*, (1897) 2 Q. B. Div. 439, 443; *Covell v. Covell*, (1872), L.R. 2P. & D. 411, 413, 414." The rule was affirmed in *Dougherty v. Dougherty*, 187 Md. 21, 29 (1946), *Lickle v. Boone*, 187 Md. 579, 582 (1947) and *Gold v. Gold*, 191 Md. 533, 537 (1948), in each of which the Court said in substantially the same language that since the legislature conferred jurisdiction in all applications for divorce upon the courts of equity, "this Court has recognized the essential difference between a divorce suit and the ordinary equity case. In divorce proceedings the court sits, not in the exercise of its ordinary equity jurisdiction, but as a divorce court and is governed by the rules and principles established in the

418

ecclesiastical courts in England so far as they are consistent with the provisions of the Maryland Code."

The injunction here was issued by the equity court in a divorce proceeding. Therefore, the court, not sitting in the exercise of its ordinary equity jurisdiction, but as a divorce court, was governed by the rules and principles established in the ecclesiastical courts of England so far as they were consistent with Maryland statutes. The injunction enjoined Husband from doing five specific things. Of the specific acts enjoined, one concerned the trespass by Husband on the real property of Wife: "ORDERED that [Husband] be, and he hereby is, enjoined from entering or remaining upon any portion of the house or land owned by [Wife] located at 10101 Chapel Road, Potomac, Maryland, without the written permission of [Wife] first had and obtained . . . ." The remaining four specific acts enjoined concerned protection of Wife's person and personal rights from crimes and torts: "FURTHER ORDERED that [Husband] be and he hereby is enjoined from attempting to carry on any telephone conversation with [Wife], . . . from making any threats of any nature against [Wife], . . . from touching or offering to touch or assaulting or offering to assault [Wife], and . . . [from communicating] with [Wife] concerning the subject matter of this action except through his attorney of record." Our attention has not been called to a Maryland statute authorizing the issuance of such an injunction by an equity court in a domestic relations action, and we find no such statute. Nor do we find that authority to issue injunctions was enjoyed by the ecclesiastical courts of England, except, perhaps, to "enjoin perpetual silence" upon a person holding out a marriage.[16] It is asserted in 2 J.P. Bishop, *Marriage,*

---

16. 3 Blackstone's *Commentaries* 123 (Hammond ed., 1890) states that of the matrimonial causes, one of the first and principal is "when one of the parties boasts or gives out that he or she is married to the other, whereby a common reputation of their matrimony may ensue. On this ground the party injured may libel the other in the spiritual court; and, unless the defendant undertakes and makes out a proof of the actual marriage, he or she is enjoined perpetual silence upon that head, which is the only remedy the ecclesiastical courts can give for this injury."

*Divorce and Separation* § 462 (1891) under the heading "What has been the Influence of the Ecclesiastical Practice on Ours":

> "The Injunction, — familiar in equity yet unknown in the common-law tribunals, may be resorted to in divorce cases by courts having equity powers. But there is no pretence that a mere common-law court could issue this process in a divorce litigation without the aid of a statute, *since it is unknown in the ecclesiastical practice.*" (emphasis added)

See 1 T.W. Waterman's *Eden on Law and Practice of Injunctions* 171-172 (1852).[17] The equity court below, as we have found, was not sitting in the exercise of its general and ordinary equitable jurisdiction but as a divorce court, and therefore, as we have indicated, it was governed by the rules and principles established in the ecclesiastical courts of England. It did not enjoy its usual equity powers. Since the ecclesiastical courts did not have the authority to issue an injunction like the one here, under the firmly established law of this State, neither did the court below.

When the chancellor below dissolved the injunction, he did so "[u]pon consideration of the Motion of [Husband] . . . and the Points and Authorities in support thereof . . . ." Among other claims in his Motion, Husband contended: (1) "There is no statutory authorization for an *Ex Parte* Pendente Lite

---

**17.** Indeed, the jurisdiction of the ecclesiastical courts of England was "defective in the ability to enforce its decrees. No other process exist[ed] but excommunication." 3 Blackstone's *Commentaries* 551 (Gavit, 1941). See M. Hale, *The History of the Common Law of England* 30-31 (6th ed. 1820).

Blackstone observed that there were "many obstinate or profligate men who would despise the *brutum fulmen* of mere ecclesiastical censures." Therefore, the common law "compassionately steps in to the aid of the ecclesiastical jurisdiction, and kindly lends a supporting hand to an otherwise tottering authority." By the common law "an excommunicated person was disabled to do any act, that is required to be done by one that is *probus et legalis homo.*" 3 Blackstone's *Commentaries* 132 (Hammond ed. 1890).

Gavit notes at 551, n. 4: "Excommunication is now prohibited. In lieu thereof, the defendant is pronounced contumacious."

420

Injunction in a divorce action and the Rules, in fact, preclude the entry of such an Injunction"; (2) "There is no general power for a Court of Equity to enter such an Injunction in a divorce action in accordance with Maryland Law"; (3) "[Wife] has provided no source from which a Court of Equity in a cause of action derives the powers to issue such an Injunction."

The first two claims made in the Motion went to the equity court sitting as a divorce court. As we have indicated, we agree that there is no statutory power or general power bestowed upon an equity court sitting in its judicially established special capacity as a divorce court which permits it to issue such an injunction. In the light of this finding, we need not determine whether Rule BB 71, § c, which provides that the "Injunction" Subtitle shall not govern an injunction in an action for divorce, alimony, support of wife or child, custody of child or annulment of marriage, necessarily precludes the issuance of an injunction in a domestic action.

The third claim of Husband in his Motion went to the general powers of a court of equity. We need not decide whether a court of equity could issue the injunction here issued because, we reiterate, the court below was sitting as a divorce court, not as an equity court, and did not have general equity powers. We observe, however, that the Court of Appeals has held that equity will relieve by injunction against continuing or repeated trespasses, committed in pursuance of a single plan or purpose. *Baker v. Howard County Hunt*, 171 Md. 159, 175 (1936). See Note, 2 Md. L. Rev. 160 (1937). On the other hand, the Court of Appeals has held that in this State no injunction will be granted to restrain the commission of a tort to the person, to restrain or prevent crime, or to enforce the performance of a moral duty, except so far as rights to property are concerned. *Chappell v. Stewart*, 82 Md. 323, 325-326 (1896). The court iterated its stand in *Bank v. Bank*, 180 Md. 254, 266 (1942). See Anno., 175 ALR 438, 461 (1948).

We conclude that the court below was correct in dissolving the injunction.

On appeal, Wife presents two questions:

(1) "Does Rule BB70, Maryland Rules of Procedure, preclude the issuance of an injunction in an action for divorce, alimony, support of wife and child and custody of minor children?"

(2) "Do the equity courts of this State have the power to protect the parties to litigation during the pendency therof, by the issuance of a *pendente lite* injunction against one of the parties

(a) Where the case is one for divorce and alimony?

(b) Where the case is one for divorce, alimony, child custody and child support?"

We have disposed of the first question by finding it unnecessary to reach it.

As to question 2 (a) we have held that the equity court sitting as a divorce court does not have the power to issue such an injunction. Wife points to *Dackman v. Dackman*, 252 Md. 331 (1969) in which wife sought permanent alimony on the grounds of the husband's adultery and filed a petition for an *ex parte* injunction, which the court issued, against the husband and various other persons and corporations to prevent him from disposing of or removing from the State his considerable assets. *Id.*, at 333. The wife also filed a petition praying that a designated resident of Nevada, where the husband was establishing a domicile, be authorized to serve upon the husband personally the petition for the *ex parte* injunction and the order of court thereon. The Court of Appeals noted, at 334, n. 1: "The injunction was later modified to a mutually satisfactory form by agreement of the parties." We do not read *Dackman* as dispositive of the authority of an equity court sitting as a divorce court to issue an injunction. It is manifest that the authority for the issuance of the injunction was not before the Court of Appeals and was not decided by it.

We note four other cases, not referred to by Wife, in which there was an injunction or enjoining order of an equity court

in a divorce or alimony action: *Ricketts v. Ricketts,* 4 Gill 105 (1846); *Gechter v. Gechter,* 51 Md. 187 (1879); *Stewart v. Stewart,* 105 Md. 297 (1907); and *Snyder v. Snyder,* 159 Md. 391 (1930). In each the trial court enjoined the husband from disposing of his property. In none was the authority of the trial court to issue the injunction or order questioned on appeal and that point was not considered by the Court of Appeals.

Wife supports the issuance of the injunction here by quoting from Myerberg, *The Practical Aspects of Divorce Practice,* 150 (2d ed. 1961), in which techniques are suggested to protect the wife from physical violence and harassment. One such suggestion, "if the case is already in the divorce court, is to petition the court for an injunction restraining the husband from molesting [the wife]." It is asserted: "A prayer for such relief can, of course, be included in the bill of complaint at the time of filing suit, and this preliminary aspect of the case should be set down and pressed for prompt hearing before the court." The authority for this statement is not given and we are not persuaded by it to depart from our contrary view.

Wife also quotes other treatises and texts [18] which indicate that the trial court may enjoin harassment of the wife by the husband. As we construe such authorities, however, they are in the frame of reference of proceedings governed by statutes particularly relating thereto, or statutes referring practice in divorce cases to equity practice or that in civil actions generally. They are not in the context of a court of equity sitting with special jurisdiction as a divorce court and bound by rules and principles of the ecclesiastical courts of England.

In the argument on question 2 (b), Wife suggests that even though an equity court derived its jurisdiction in the case for divorce, alimony or annulment from the ecclesiastical courts of England, her action also seeks custody and support of

---

18. We list them as they are cited in Wife's brief: High on Injunctions, 4th ed., pp. 1389-1390; 27 A. C.J.S. § 103; Law of Domestic Relations, Clark, pp. 392, 393, 394; 24 Am. Jur. 2d, 1142-1143.

minor children. "That jurisdiction," she asserts, "is not in any way derived from the Ecclesiastical Courts of England, and, consequently, the court in such proceeding may enter an injunction under its general equity powers." Even if a court in the same action may sit as a general equity court as to some relief prayed and as a special divorce court as to other relief prayed, the injunction here did not go to the custody and support of the minor children but to the harassment of Wife. We think it clear that it was issued by the court as a divorce court, and we have found that there was no authority for it. And although the court as an equity court may have enjoined a continuing trespass in certain circumstances, we have seen that it was without power, as the law in this jurisdiction stands, even in that capacity, to prohibit the acts it attempted to restrain.

We have a final observation. Whatever the reasons were a hundred years ago to distinguish between a divorce suit and the ordinary equity case and to so construe the statutory provisions reading that the equity court "shall hear and determine a case of alimony in as full and ample a manner as such case could be heard and determined by the Ecclesiastical Courts of England" in such a way as to establish a difference in the powers of a court of equity sitting as a divorce court vis-à-vis a court of equity sitting in exercise of its ordinary equity jurisdiction, we think that the purposes have been fully served. The artificial distinction drawn between divorce jurisdiction and equity jurisdiction now leads only to confusion and uncertainty. *Nelson* points out, § 1.05: "Due to the scope of modern divorce laws in most states, and the fact that such statutes usually refer practice in divorce cases to equity practice or that in civil actions generally, the extent to which practices of the English ecclesiastical courts might be resorted to by way of precedent is now rarely of practical interest." We see no real reason today for the old rules and principles of the ecclesiastical courts of England to be of substantive interest in this State and are aware of no compelling incentive for Maryland to remain unique in this respect. *Nelson* suggests, § 1.05, with respect to reference to ecclesiastical precedents

that "[i]t may well be regarded as doubtful whether, in matters of practice, it would be proper to do so, as no American court is a heritor of, or of comparable purpose with, the ecclesiastical courts of England and Scotland." The matter may be easily remedied by statute. Perhaps the General Assembly will be favorably disposed to enact appropriate legislation.

*Order of 11 July 1975 dissolving injunction of 11 June 1975 affirmed; appellee to pay costs.*