558 A.2d 807

**Thomas W. MAGNESS, Jr.**

v.

**Mary Elizabeth MAGNESS.**

**No. 1457, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

June 9, 1989.

Stanley H. Katz (Roslyn Soudry, on the brief), Towson, for appellant.

Bruce A. Kaufman (Rosenthal & Kaufman, P.A., on the brief), Baltimore, for appellee.

Argued before BLOOM, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

The opening salvo in this family dispute case was an ex parte order. The issues raised in this appeal surround the propriety of that order. Specifically, did the motions judge abuse his discretion by issuing the order in the absence of notice to the husband? We hold that the motions judge did not err.

Thomas and Mary Magness married in 1971. Two children were born to them—one in 1978, the second in 1980. Mary Magness left the family home with the children on May 13, 1988. She left her husband a note expressing her regrets and a letter from her counsel requesting that he have his attorney contact her attorney "at his earliest convenience." On the morning of May 17, Mary Magness filed a Complaint for Divorce [1] and verified Motion for Ex Parte Order, with exhibit. The court entered an Ex Parte Order that same day, awarding custody of the children to Mary Magness pending a pendente lite hearing. The order also enjoined Thomas Magness "from harassing, intimidating or otherwise threatening" his wife, and ordered Thomas Magness to return the family station wagon to her, also pending a pendente lite hearing. Thomas Magness was enjoined from interfering with the children's schooling or removing them from school without his wife's agreement, as well as from spending, transferring or otherwise disposing of any of the parties' property. The ex parte order recited that it was subject to the further order of the court.

---

[1]. Mrs. Magness also filed a Financial Statement, Interrogatories, and a Request for Production of Documents.

On May 20, 1988, Thomas Magness noted an appeal,[2] filing a motion in this Court to stay the order. A response was filed and argument had. As a result, on June 13, 1988, the ex parte order and all proceedings were stayed pending disposition of this appeal.

## DISMISSAL

■ Appeals lie from final judgments. In that regard, the jurisdiction of appellate courts rests firmly upon Md. Cts. & Jud.Proc.Code Ann. § 12–301 (1974, 1984 Repl.Vol.). The purpose of this provision is to prohibit piecemeal appeals. Appellant makes no contention that this is a final judgment but relies instead on the exceptions contained in Md.Cts. & Jud.Proc.Code Ann. § 12–303 (1974, 1984 Repl. Vol., 1988 Cum.Supp.). This section permits appeals from certain interlocutory orders. Appellee requests us to dismiss the appeal on the basis that, while an injunction is an interlocutory order, an order granting an injunction is appealable only after an answer has been filed. § 12–303(3)(i). Appellee correctly points out that no answer had been filed when the appeal was noted; hence, the appeal was premature. While that is accurate, an order which deprives one of "custody of his child" can be appealed as an interlocutory order under § 12–303(3)(x).[3] This order did precisely that; the fact that the order here was not intended to be more than of brief duration does not alter its appealability. Our view, however, as to whether an

---

**2.** He apparently filed an answer to the Complaint for Divorce, but not until June 20, which was after the order for appeal was noted.

**3.** Section 12–303(3) provides in pertinent part:
"A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:
\*     \*     \*     \*     \*     \*
"(3) An order:
\*     \*     \*     \*     \*     \*
"(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order."

appeal was the best remedy will become obvious as we move along.

Before we examine either the lack of notice or any possible abuse of discretion, we examine the evolution of injunctions in divorce, alimony, and annulment cases in Maryland.

## INJUNCTIONS

The earliest case in Maryland which referred to an injunction in a domestic case was *Ricketts v. Ricketts*, 4 Gill 105 (1846). The trial court in *Ricketts* had enjoined the husband from alienating his property during the proceeding. The final order continued that injunction until the husband conveyed to a trustee sufficient property to provide the alimony to be paid. The propriety of the injunctive relief was not questioned nor was it at issue on appeal.

The broad general statement was often made in the early cases that "equity protects only property rights." *Taylor v. Kercheval*, 82 F. 497 (D.Ind.1897); *Angelus v. Sullivan*, 246 F. 54 (2d Cir.1917); *Chappell v. Stewart*, 82 Md. 323, 325–26, 33 A. 542 (1896), *appeal dismissed*, 169 U.S. 733, 18 S.Ct. 940, 42 L.Ed. 1215 (1898). The Supreme Court stated in *In Re Sawyer*, 124 U.S. 200, 210, 8 S.Ct. 482, 487, 31 L.Ed. 402 (1888): "The office and jurisdiction of equity, unless enlarged by statute are limited to the protection of rights of property." Since domestic cases in Maryland and elsewhere were in chancery, an equity court, they were deemed to be subject to the same restriction.

The case of *Vanderbilt v. Mitchell*, 72 N.J.Eq. 910, 67 A. 97 (1907), decided by the New Jersey Court of Errors and Appeals, is considered a landmark case in broadening the use of injunctions in domestic cases. The court granted an injunction precluding the use of a fraudulent birth certificate. The defendant, the wife of the plaintiff, was living in adultery with another. As a result of this relationship, a child was born. The defendant convinced the attending physician that her husband was the child's father and the

birth certificate was so completed and recorded. The certificate by statute was prima facie evidence of the facts it contained. Suit was brought to cancel the certificate and to enjoin the mother and child from claiming that the child was the legitimate offspring of the plaintiff.

On appeal, the Court perceived the basis of its decision to be the exercise of property rights. The Court relied on two points: (1) that because of the fraudulent certificate, the husband would be prima facie responsible for the child's support; and (2) at the husband's death, the certificate would be evidence of inheritance. If for some reason the prima facie liability could not be rebutted, it would be fixed; hence, the injunction was for the protection of a property right.

The Court commented in dicta that "[i]f it appeared ... that only the complainant's status and personal rights were thus threatened ... we should hold, and without hesitation, that an individual has rights, other than property rights, which he can enforce in a court of equity and which a court of equity will enforce against invasion." *Vanderbilt*, 67 A. at 100.

The *Vanderbilt* case was the precursor of a broader view of the power of the equity court in most states. Some added that authority by statute; others eased into the wider power through case law. Maryland first joined in through the latter vehicle. By 1942, the Court of Appeals no longer precluded injunctions in domestic cases strictly because property rights were not involved, but had adopted the view of the Restatement (First) of Torts, § 943 (1939), which stated:

"The practicality of drafting and enforcing the order or judgment is one of the factors to be considered in determining the appropriateness of injunction against tort.... This is true whether the purpose of the injunction *is to restrain threatened tort* or to compel affirmative reparation. In both, *the court must delineate with practicable precision the action which is to be prohibited or required,* and must envisage the practicality of enforce-

ment measures should the defendant refuse to comply."
(Emphasis added.)

This position was approved in *Bank v. Bank*, 180 Md. 254,
263, 23 A.2d 700 (1942), which, while rejecting the injunction
and referring to the limitation of injunctions to property
rights, opened the door to injunctive relief for personal
wrongs. While apparently never again specifically ad-
dressed, the practice gradually grew to permit the protec-
tion of personal, not merely property, rights.

### —Kapneck v. Kapneck—

The use of ex parte injunction in domestic cases became
well accepted and frequently used. Thus, in June of 1975,
the Circuit Court for Montgomery County, sitting as a court
of equity, issued such an order enjoining the husband "from
harassing [the wife] and the minor children of the parties"
on the verified petition of the wife. On appeal, Chief Judge
Orth, speaking for this Court in *Kapneck v. Kapneck*, 31
Md.App. 410, 356 A.2d 572 *cert. denied*, 278 Md. 739 (1976),
*petition to intervene and seek review denied, Women's
Law Center, Inc. v. Kapneck*, 278 Md. 739 (1976),[4] held that
the injunction was invalid because the court was not sitting
in exercise of its ordinary jurisdiction but as a divorce court
and, as such, it did not enjoy its usual equity powers. This
was because the court's jurisdiction was founded on
§ 3–603 Cts. & Jud. Proceedings which provided:

"A court of equity has jurisdiction in an action for di-
vorce, alimony, or annulment of marriage. The court
shall hear and determine a case of alimony in as full and

---

**4.** In *Winston v. Winston*, 290 Md. 641, 643 n. 1, 431 A.2d 1330 (1981),
the Court points out that the "publisher's notes," *i.e.*, Shepard's Mary-
land Citations providing subsequent case history in regard to *Kapneck*
are erroneous. The notes state that the Court of Appeals denied
certiorari when, in fact, no petition seeking certiorari was ever filed
by either party. The Court of Appeals, however, denied a request by
the Women's Law Center, Inc. to intervene and seek review of our
decision in *Kapneck*. *See Women's Law Center, Inc. v. Kapneck*, 278
Md. 739 (1976).

ample manner as such case could be heard and determined by the Ecclesiastical Courts of England."

Since the "ecclesiastical courts did not have the authority to issue an injunction like the one here, under the firmly established law of this State, neither did the court below." *Kapneck*, 31 Md.App. at 419, 356 A.2d 572. The opinion concluded with an open invitation to the Legislature to remedy the jurisdictional issue by appropriate legislation.

### —Legislation—

This invitation was quickly accepted and in 1977 the Legislature amended § 3–603 by lettering the existing section as (a) and adding new paragraph (b):

> "(b) **Injunction.**—A court of equity sitting in an action for divorce, alimony, or annulment has all the powers of a court of equity, and may issue an injunction to protect any party to the action from physical harm or harassment." [5]

Not only did this provision solve the problem raised in *Kapneck*, it dispelled all doubt, if any then existed, that the equity court could protect not only property rights but also personal rights in a case involving divorce, alimony, and annulment.

### —Winston v. Winston—

In September Term 1980, the Court of Appeals granted certiorari in *Winston v. Winston*, 290 Md. 641, 431 A.2d 1330 (1981), specifically directing the parties to address the issue raised in *Kapneck*. In *Winston*, the trial judge refused an injunction, declining to find contempt based on the husband's failure to transfer the family home. The trial judge relied for his decision on *Kapneck*. The Court

---

**5.** This was revised and recodified in 1984 as § 1–203(a) Family Law Article:

> "(a) **Injunctive power of court.**—In an action for alimony, annulment, or divorce, an equity court:
> (1) has all the powers of a court of equity; and
> (2) may issue an injunction to protect any party to the action from physical harm or harassment."

of Appeals reversed, holding that a fair reading of § 3–603, as enacted by chapter 221 of the 1977 Laws, demonstrated

"that the General Assembly was unambiguously endowing the equity court sitting in divorce, alimony, and annulment proceedings with all the general powers normally exercised by that court in other matters. In addition, the enactment specified that this authority is intended so as to encompass the right to enjoin a party in a domestic relations proceeding from physically harming or harassing another party."

Moreover, the Court of Appeals went on to hold that, regardless of the enactment of chapter 221 of the 1977 Laws, it would still have held the injunction appropriate. The Court concluded that, since all the rules were made applicable to divorce, alimony, and annulment actions by then Maryland Rule 1 a 1 and since then Maryland Rule 685 provided for the use of injunction to enforce its decrees, that injunction was available to enforce the court's decision as was contempt. The Court relied on the incorporation of the provision of the marital settlement agreement into its decree by the trial court as the basis for that decision.

## THE EX PARTE INJUNCTION

■ BB Rules provide certain constraints, but Rule BB71(c) specifically excludes divorce, alimony and support of wife or child, custody of child, or annulment from the BB Rules; hence, they do not apply. Appellant relies therefore on Rule 1–351 [6] and a general due process argument.

### —Rule 1–351—

Appellant cites Rule 1–351, which provides:

"No court shall sign any order or grant any relief in an action upon an ex parte application unless:

---

**6.** Under Rule 1–101, all Rules in Title 1 apply in all courts "except the Orphans Courts and except as otherwise specifically provided." Hence, Rule 1–351 applies.

(a) an ex parte application is expressly provided for or necessarily implied by these rules or other law, or

(b) the moving party has certified in writing that all parties who will be affected have been given notice of the time and place of presentation of the application to the court or that specified efforts commensurate with the circumstances have been made to give notice."

Rule 1–351 "is new to the Maryland practice and has no precedent in the federal rules. Its purpose is to clarify existing obligations in lawyers' dealings with the court." Niemeyer and Richards, *Maryland Rules Commentary* at 41. Because the Rule is so new, we have no cases to guide us in its correct application. What the Rule is clearly meant to protect against, however, is the fundamental unfairness of one party approaching a judge and obtaining an order without first according an adversary a chance to present his or her own position. The policy behind the Rule, is expressed by Niemeyer and Richards, *Maryland Rules Commentary* at 41:

"Fairness of the adversary system requires that judges not be approached or requested to take action in a unilateral or *ex parte* fashion. The prohibition against *ex parte* communications with the court applies to any issue in any location, whether in court, in a social context, or otherwise. It makes no difference whether the communication relates only to a procedural or administrative matter. Such matters are often of strategic importance to the parties. The fundamental precept of the adversary system is that both sides have notice and the judge give both sides an opportunity to present a position and oppose the other party's position. It is from the interplay of the presentations by all parties that a fair judgment can be made."

There are two exceptions to its general prohibition against an order granted upon ex parte application. The first is that the "ex parte application is expressly provided for or necessarily implied by ... other law." Rule 1–351(a). The second exception is where a moving party gives prior

notice, or has made "specified efforts commensurate with the circumstances," but the other parties fail to appear. In the latter situation, the other party's failure to appear "is analogous to a waiver of appearance or default," because the party *has* been notified and has chosen not to appear. Niemeyer and Richards, *Maryland Rules Commentary* at 42. Thus, the court may not issue any ex parte order or injunction in the absence of notice unless it is expressly provided for or necessarily implied by the rules or other law.

Pursuant to Md.Fam.Law Code Ann. § 1–203(a) (1984), in an action for alimony, annulment, or divorce, the court has "all the powers of an equity court," and "may issue an injunction to protect any party to the action from physical harm or harassment." The right to issue an injunction to protect a party from physical harm necessarily implies the right to issue that injunction ex parte based on a verified affidavit and under certain constraints. Given that posture, there is no requirement that notice be given. We explain.

The purpose of an interlocutory injunction is to preserve the status quo during litigation in order to prevent irreparable injury to the moving party and to preserve the court's ability to render complete relief. "Status quo" is defined as the last uncontroverted status preceding the pending litigation. *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 487 F.Supp. 1248 (D.C. Md.1980), *aff'd,* 650 F.2d 495 (4th Cir.1981). An interlocutory injunction does not determine any right of any party, but is simply intended to suspend action until the other party has an opportunity to answer and defend. *Harford County Ed. Ass'n v. Board of Ed. of Harford County,* 281 Md. 574, 585, 380 A.2d 1041 (1977). The decision to grant or deny an interlocutory injunction is within the sound discretion of the court. *Zoning Administrator, Carroll County v. Ireland,* 46 Md.App. 429, 433, 418 A.2d 221 (1980). Turning then to the injunction itself and to whether the granting of the order constituted an abuse of discretion, we view the order strictly in light of the

facts contained within appellee's verified motion,[7] and conclude that it merely preserved the status quo.

The affidavit of appellee contained the following recitation of facts. Appellee was filing for divorce on the grounds of desertion, extreme cruelty, and voluntary separation. She had departed the home four days before, moving to a residence within the same school district. Appellee continually had been the children's primary caretaker; the children were ten and seven. Appellee was a registered nurse and worked part time as a pediatric nurse, enabling her to be home part-time with the children. She averred that appellant had been harassing and threatening her, and that, despite the recommendations of his pastoral counsellor, he refused to secure professional help with his emotional problems. Appellee stated that appellant's medical doctor had prescribed a tranquilizer (Xanax) for him to control his emotional state. Appellant had removed from the bank all the money contained in the parties' joint account (about $8,000), which represented the bulk of the parties' liquid assets. When appellee left the family home, she left a letter asking that appellant have his attorney contact her counsel, and that no contact had been made, despite her note, and despite the fact that appellant told appellee he *had* consulted counsel recently. In a separate note, appellee left a number where appellant could reach her, and appellant called her mother who told him where she was. Subsequently, appellee received repeated telephone "calls" in which whoever called (presumably appellant) hung up as soon as she answered. Appellee averred that they owned two cars, one of which (a station wagon) she drove and used to transport the children, for shopping, and to go to and from her job, but the car had been removed from her present residence; appellee believed appellant took the car, effectively depriving her of the ability to take care of any

---

7. While it could be argued that appellant's failure to file a motion to set aside the injunction amounted to a failure to preserve this issue for review, this position was not taken by appellee; hence, we will consider the appropriateness of the injunction.

emergencies that might arise in regard to the children. Moreover, appellee stated that appellant occasionally threatened to take the children and keep them from her, and that she was worried that he would take the children while they were at school.

The order in the instant case basically did nothing more than preserve the status quo because it was narrowly drawn and because it merely kept the domestic situation stable until such time as a hearing could be had. The order provided that the children would stay, pending a pendente lite hearing, with their mother who had been their primary caretaker up until this time. Appellant had the right, according to the order, to visit the children at mutually agreed-upon times. Because appellant had threatened to take away his children, the order recited that he should not remove them from school except by agreement.

Appellee's affidavit alleged facts illustrative of a volatile domestic situation; she was afraid of appellant's highly charged emotional state, a state that appeared to be likely to continue, in light of the fact that he refused to obtain professional help. Appellee in her divorce complaint alleged extreme cruelty, and that she and appellant were living separately with the intention of terminating the marriage. Thus, the ex parte order's provision that appellant not threaten or harass appellee was eminently reasonable, under the circumstances, as was the provision calling for appellant *not* to remove his children from school without prior agreement. It was obviously appellee's fear that appellant would take the children and keep her from seeing them. It is perhaps the private nightmare of every parent in the midst of an emotionally charged divorce that an enraged spouse will take the children and not be heard from again. Based on the affidavit, appellee's fear in the instant case was not unfounded, but based on appellant's numerous threats to do just that. .

The other provisions in the order were also reasonable and designed to preserve the status quo until further judicial determination could be secured. The order provided

that appellant must return the station wagon which had disappeared from appellee's present address.[8] Since the couple owned two cars, it was reasonable to provide that appellee have and keep the car she normally used until a pendente lite hearing.

Had appellant raised the issue, we might have considered the provision enjoining appellant "from spending, transferring or otherwise disposing of any of the parties' property, including any monies which may be the proceeds of any joint accounts previously titled to the parties" to be overbroad. If taken literally, this would preclude appellant from spending his salary. We doubt that this was what this provision was intended to do. It appears, rather, to have been aimed at appellant's removal of all funds contained within the parties' joint bank account.

The trial court in the instant case obviously believed that there was a necessity for the ex parte order and, based on the facts alleged by appellee, we agree. Appellee had no car and appellant had removed all the money from their joint checking account, leaving her no financial resources in case of an emergency. Allegedly, appellant was engaging in behavior aimed at harassment, and appellee was frightened that appellant would seek to harm her further by taking the children, just as he had taken the car. We are understandably reluctant to hold that a trial judge is totally bereft of power to issue an ex parte order in such circumstances. Indeed, not to sign the order in the instant case could have resulted in the continuance of the threatening behavior aimed at appellee, with potentially tragic results. We find ample facts alleged by appellee to justify its issuance. It was open at all times to appellant to seek to strike or modify the ex parte order.

---

**8.** Appellee and the children were staying at her sister-in-law's home. The station wagon was jointly owned by appellant and appellee, and appellant had a set of keys to the car, even though appellee was its primary driver.

Appellant contends that *Tidler v. Tidler,* 50 Md.App. 1, 435 A.2d 489 (1981), supports his position that notice is an absolute requirement. This case is easily distinguishable. In *Tidler,* the case had *already* been litigated and an order had been entered granting alimony. The court undertook, at the behest of appellee, to strike the alimony award *despite* the fact that appellant had received no notice. The factual posture of the instant case is quite different. Here we have an order merely maintaining what already existed until the final judicial determinations could be made.

Counsel for appellant also contends that a letter in which appellee's counsel requested that appellant's counsel contact him at counsel's earliest convenience was misleading because appellee's counsel proceeded to file suit on the fourth day after delivery of the letter. The letter itself suggested an "amicable" resolution of the issues, not the filing of a suit, argues appellant. This contention loses some of its apparent persuasiveness in view of appellee's verified statement that appellant had told her he had recently consulted with counsel.

■ Appellant also makes much of the fact that the complaint was stamped in at 10:02 a.m. and the order was entered at 10:03 a.m. He urges that the court violated its own rules by signing an order prior to the "impetration of the original suit." [9] It is much the better practice for the court to decline to entertain an ex parte order before the suit has been filed. A potential problem exists if the proposed suit is not filed, but a copy of the order is served on a party. In addition, the court has no assurance that the pleadings before him or her will be the ones ultimately filed. In this case, however, we can see no prejudice or harm that occurred as a result and the issue is now moot as the case was duly processed. We hold that the court acted within its discretion in issuing the ex parte order.

---

9. Appellant cites *Reed v. Sweeney,* 62 Md.App. 231, 488 A.2d 1016, *cert. denied,* 303 Md. 471, 494 A.2d 939 (1985). While the words are quoted from *Reed v. Sweeney,* the context of the quote has nothing to do with the point being made.

## MISCONDUCT

### —Judicial Misconduct—

Appellant has placed much emphasis on the trial court's alleged violation of Rule 1231, Canon 3(A)(5) [10] of the Maryland Code of Judicial Conduct. We have indicated in the foregoing discussion that the trial judge acted within his discretion. Canon 3 is aimed at fostering the impartial and diligent performance of judicial duties, and appellant has asserted no facts which would indicate that the trial judge was not impartial or was otherwise acting in an unethical fashion.

### —Attorney Misconduct—

█ Appellant contends the wife's counsel was successful in obtaining the ex parte order by "traveling beyond the outer limits of three provisions" of the Maryland Rules of Professional Conduct:

"Rule 3.3(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

"Rule 3.4(c) A lawyer shall not knowingly disobey an obligation of the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

"Rule 3.5(a)(7) A lawyer shall not communicate ex parte about an adversary proceeding with the Judge or other official or for which the proceeding is pending, except as permitted by law."

He further points out the Comment to Rule 3.3, which guides the court and counsel in an ex parte proceeding:

---

**10.** Canon 3(A)(5) provides:

"(5) A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding."

"Ordinarily, an advocate has the limited responsibility of presenting one side of the matters that a tribunal should consider in reaching a decision; the conflicting position is expected to be presented by the opposing party. However, in an ex parte proceeding, such as an application for a temporary restraining order, there is no balance of presentation by opposing advocates. The object of an ex parte proceeding is nevertheless to yield a substantially just result. A judge has an affirmative responsibility to accord the absent party just consideration. The lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision."

Appellant then presents us with a list of disclosures appellee's counsel was required to make, contending that the failure to make these disclosures constituted a violation mandating reversal. None of these facts would have had any material effect on the propriety of granting this particular ex parte order.[11] Moreover, appellant admits these facts are not a part of the record and are therefore not before us. If appellant believes that failure to reveal them constitutes a violation of the Rules of Professional Conduct, he should file a report with the Attorney Grievance Commission. By the same token, if he has knowledge that a judge has committed a violation of a rule of judicial conduct that raises a substantial question as to his fitness for office, counsel for appellant has an analogous obligation to report the alleged misconduct to the Commission on Judicial Disabilities. *See* Rule 8.3. We assume counsel's failure to report these alleged violations is a concession either that they do not pose a violation or at worst do not raise a substantial question as to fitness.

---

**11.** The "material facts" were (1) the separation was not mutual and voluntary and the wife deserted the husband; and (2) appellee took many of the household furnishings to her new and undisclosed location.

Moreover, the Scope of the Rules of Professional Conduct provides:

"Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies.... Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty."

The Maryland Code of Judicial Conduct similarly is intended "to protect the public and, thus, preserve the integrity of the judicial process, maintain public confidence in the judiciary, and create a greater awareness of proper judicial behavior on the part of judges themselves." *K & K Management, Inc. v. Chul Woo Lee*, 316 Md. 137, 151, 557 A.2d 965, 971 (1989), quoting the National Center for Professional Responsibility, Am. Bar Assoc., *Professional Discipline for Lawyers and Judges* 14 (1979). For these and the foregoing reasons, we hold appellant's reliance on the disciplinary rules to be misplaced.

—The Constitutional Issues—

██ Appellant contends that his constitutional right to due process of law was violated by the imposition of the ex parte order. The simple answer to this contention is that appellant failed properly to raise this issue below. Appellant could have, at any time, filed a motion for a hearing in this matter. Instead, he chose to file this appeal and ignore all existing mechanisms for an opportunity to be heard. One cannot be denied that which one does not request. We

certainly cannot reach out and establish constitutional standards in a case such as this, where the issue of a denial of notice and hearing was never squarely placed before the trial judge. It may be argued that appellant was denied the opportunity to present these arguments *because* of the ex parte nature of the proceeding. The ex parte nature of this order does not, however, relieve appellant of the obligation to utilize the safeguards that are there. A judicial determination of constitutional validity must be pursuant to an honest and antagonistic assertion of rights. *Burco, Inc. v. Whitworth*, 81 F.2d 721 (4th Cir.1936), *cert. denied*, 297 U.S. 724, 56 S.Ct. 670, 80 L.Ed. 1008 (1936). A court should not anticipate a question of constitutional law in advance of the necessity of deciding it. *Petite v. United States*, 361 U.S. 529, 531, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960). A proper concern for the Supreme Court's long standing policy of avoiding unnecessary constitutional issues requires that the necessity of determining a constitutional issue be shown. *Elkins v. Moreno*, 435 U.S. 647, 661, 98 S.Ct. 1338, 1346–1347, 55 L.Ed.2d 614 (1978). We do not mean to imply that a party must show that he or she exhausted every possible avenue before claiming a due process violation—rather, we hold that in the instant case appellant did not make a good faith attempt to be heard at the trial level, and therefore we cannot consider his claim.

■ Appellant also contends that the trial court exhibited a maternal preference by ordering that appellee should retain her status as primary caretaker of the couple's children, thereby violating Art. 46 of the Maryland Constitution.[12] Again, this is an issue appellant failed properly to raise by requesting a hearing and thus, squarely presenting his position for the trial court's consideration. Moreover, this was *not* a custody determination, but, as we have previously stated, a preservation of the status quo *before* a pendente lite hearing. We also find nothing to indicate that

---

**12.** Article 46 provides:
   "Equality of rights under the law shall not be abridged or denied because of sex."

the trial court used maternal preference in determining that the children should remain with their mother pending further determination.

## CONCLUSION

Despite the passage of a year, we see no reason why the injunction should not be reinstated. It is a matter of some urgency that a pendente lite hearing be held quickly to determine custody, visitation and support. If appellant wishes to move to strike all or part of the injunction and request a hearing, he is entitled to do so. If appellant had been successful in this appeal, appellee could have sought to hold a pendente lite hearing to grant the same relief. The burden of proof in either case would have been upon appellee as the proponent of the injunction. *See State Dept. of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51 (1977). It is not lost on us that this is precisely what would have occurred *regardless* of the outcome of this appeal. The only difference would have been in timing—the difference of perhaps a week to schedule a hearing, compared to almost a year to resolve this appeal.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

MANDATE TO ISSUE FORTHWITH.