[No. 1006-2.    Division Two.    December 3, 1974.]

CORINNE KATHERINE DICKSON, *Respondent,* v. PETER M. DICKSON, *Appellant.*

*Frederick Frohmader,* for appellant.

*E. Albert Morrison,* for respondent.

ARMSTRONG, J.—In this appeal we are faced with a challenge to a post-divorce injunction permanently enjoining certain conduct by an ex-husband. It is claimed that this equitable relief denies him his rights of free speech and free exercise of religion. We hold that the injunction must be modified to accord Mr. Dickson his First Amendment rights.

After a number of years of marriage, not disclosed in the record, Corrine and Peter Dickson were divorced in January 1970. Mr. Dickson was ordered to pay support for the three minor children, who remained with Mrs. Dickson, in the sum of $75 per month until the oldest became 21 years of age, when it would be increased to $85 per month for each of the younger two minors until they reached 21 years

of age, married, or became self-supporting. The oldest, Pamela, reached the age of 21 in November 1971. On August 23, 1972, the next oldest, Philip, became 18 years of age, and on February 3, 1972, the youngest, Michelle, reached the age of 14. Neither Philip nor Michelle is married or self-supporting.

Continuously since the divorce, Mr. Dickson has been protesting the granting of the decree and campaigning for a statutory prohibition of divorce. His activities to this end include writing public officials and organizations across the country, publishing pamphlets and instituting suit to change the law. He works primarily out of a small office established for the purpose of operating the movement. There is evidence that Mr. Dickson has involved his wife in his efforts to outlaw divorce, made derogatory statements about her mental health, asserted that she is still his wife, and interfered with her privacy in other ways.

In June 1971, Mrs. Dickson petitioned the court to increase the amount of support for the two minor children to $125 per month and for injunctive relief against Mr. Dickson's conduct. On July 18, 1972, Mrs. Dickson was granted a temporary restraining order prohibiting Mr. Dickson from engaging in certain conduct. It stated in relevant part:

> [I]t is ORDERED, ADJUDGED AND DECREED that the defendant be and he is hereby temporarily restrained from harassing the plaintiff in any way whatsoever, from writing her letters, from going upon the premises that she may occupy wherever that might be, from cursing plaintiff in public or private, from accusing her of being insane, from taking delivery of mail in her name at his address or anywhere else, from representing that plaintiff is defendant's wife, or from any way harassing, contacting, speaking to or communicating with the plaintiff or otherwise interfering with her freedom and personal enjoyment,
> . . .

At trial on January 9, 1972, Mrs. Dickson, without objection from Mr. Dickson, withdrew her request for a modification of the award of support for Philip, who had turned 18 years of age in August 1972. The trial judge awarded an

increase in support payments for Michelle to $125 per month. He also issued a permanent injunction, which was identical to the temporary restraining order except for the deletion of "cursing plaintiff in public or in private" and "from taking delivery of mail in her name at his address or anywhere else."[1]

On appeal, Mr. Dickson's primary contention is that the portion of the permanent injunction which prohibits him from representing that Mrs. Dickson is his wife infringes upon his right to free exercise of religion and right to free speech. Mr. Dickson also challenges the continuation of his duty to pay $85 per month toward the support of Philip.

Mr. Dickson relies heavily on cases where it was held that the First Amendment prohibits prior restraint through injunction. It is true that in general, torts against the person such as defamation, may not be enjoined. *Alberti v. Cruise*, 383 F.2d 268 (4th Cir. 1967); *Konigsberg v. Time, Inc.*, 288 F. Supp. 989 (S.D.N.Y. 1968). There is usually an adequate remedy at law to redress injury to personal rights. *Alberti v. Cruise, supra*; *Galella v. Onassis*, 353 F. Supp. 196 (S.D.N.Y. 1972), *aff'd and modified*, 487 F.2d 986 (2d Cir. 1973).

However, First Amendment rights are not absolute. Many courts have applied a balancing test, weighing the value of the First Amendment right against the intrusion into another's privacy. *E.g., Galella v. Onassis, supra*; *Kapellas v. Kofman*, 1 Cal. 3d 20, 459 P.2d 912, 81 Cal. Rptr. 360 (1969). In *Galella*, the court balanced Mrs. Onassis' interest in privacy and the public interest in being informed, and enjoined a photographer from approaching within certain distances of Mrs. Onassis, her children and

---

[1]The judgment stated in relevant part: "Said Decree is further amended to include a permanent injunction enjoining the defendant from harassing the plaintiff in any way whatsoever, from writing her letters, from going upon the premises that she may occupy wherever that might be, from accusing her of being insane, from representing that plaintiff is defendant's wife or from in any way harassing, contacting, speaking to or communicating with the plaintiff or otherwise interfering with her freedom and personal enjoyment."

their school. While the distances were shortened on appeal, the injunction was otherwise affirmed.

If the First Amendment right is not deemed paramount, injunctive relief is appropriate if there is no adequate remedy at law. In *Galella,* the court enjoined the important First Amendment right to gather news because it found that the harassment was not otherwise redressable. In the family setting, injunctions prohibiting a spouse or child from associating with another have been upheld. *Henley v. Rockett,* 243 Ala. 172, 8 So. 2d 852 (1942); *Stark v. Hamilton,* 149 Ga. 227, 99 S.E. 861, 5 A.L.R. 1041 (1919).

Applying this analysis to the case at bar, we conclude that the injunction as modified in the manner we indicate below does not deny Mr. Dickson his First Amendment rights.

■ Involved here is the basic constitutional right to speak and write what one wishes. Mr. Dickson has asserted this right in his movement to reform the divorce law by writing letters and talking to others. He has also stated, however, that Mrs. Dickson is still his wife and that she is insane. While it cannot be said that his campaign to outlaw divorce unjustifiably interferes with Mrs. Dickson's life, even though she may not agree with his views, his statements about her mental health and relation to him cannot be so characterized. Since they are injurious to her reputation and subject her to scorn and ridicule, they are clearly defamatory. *Grein v. LaPoma,* 54 Wn.2d 844, 340 P.2d 766 (1959); W. Prosser, *The Law of Torts* § 111 (4th ed. 1971). Defamation is not protected by the First Amendment. *Beauharnais v. Illinois,* 343 U.S. 250, 96 L. Ed. 919, 72 S. Ct. 725 (1951). As we detail below, these statements, when considered in light of the fact that she may date other men or marry again, may lead others to think of her as a loose woman, as adulterous, or as bigamous. In addition to the indirect effect this will have on the children because their mother will be upset, there will be a direct effect on them through damage to the reputation of their family and to their feelings about their mother. Moreover, applying the

balancing test enunciated in *Galella,* interference with Mrs. Dickson's privacy and the children's well-being outweighs Mr. Dickson's absolute exercise of his First Amendment rights of free speech and free exercise of religion.

Turning next to the question whether injunctive relief is appropriate, we bear in mind that the First Amendment is not absolute and that we must determine whether there is an adequate remedy at law. The reasons why injunctive relief was proper in *Galella v. Onassis, supra,* are applicable here. There the court stated:

> We conclude there is no adequate remedy at law because of: the recurrent nature of plaintiff's invasions of defendant's rights; the need for a multiplicity of damage actions to assert defendant's rights; the imminent threat of continued emotional and physical trauma; and the difficulty of evaluating the injuries in this case in monetary terms.

*Galella v. Onassis, supra* at 235. As in *Galella,* Mr. Dickson's statements have been recurrent, there is the threat of emotional harm and it would be difficult to evaluate the injury in monetary terms.

However, we need not rely solely upon these criteria. The thrust of the injunction is the protection of Mrs. Dickson's minor children. It is clear that a court in a divorce action retains jurisdiction over children of the marriage until they reach majority, in order to assure that their best interests are furthered. *State ex rel. Hale v. Long,* 36 Wn.2d 432, 436, 218 P.2d 884 (1950); *Dyer v. Dyer,* 65 Wash. 535, 537, 118 P. 634 (1911). This is not a hollow duty. Our state courts have often reiterated that injunctive relief is proper where the welfare of minor children is involved. *Pearce v. Pearce,* 37 Wn.2d 918, 226 P.2d 895 (1951); *Aubry v. Aubry,* 26 Wn.2d 69, 173 P.2d 121 (1946). This position undoubtedly stems from the well-founded conclusion that there is often no adequate remedy at law where minors are concerned. Therefore, with its continuing jurisdiction over minor children, a court is empowered to grant equitable relief prohibiting interference with the custody, welfare and best interests of children even after the

divorce decree is final. *Budlong v. Budlong,* 51 R.I. 113, 152 A. 256 (1930). Thus, in the case at bar the power of the trial court in protecting the welfare of minor children was substantial. While these principles may appear obvious, they are not often enunciated and consequently we have done so here, where their importance should not be under-estimated.

There was sufficient evidence that Mr. Dickson's conduct interfered with the welfare of his minor children, Michelle and Philip. At one time, he was receiving mail in Mrs. Dickson's name at his office. This conduct seems to have ceased after the issuance of the temporary restraining order. At trial, Mrs. Dickson recounted several occasions when his conduct was harassing and embarassing. He has told several persons that she is insane and sick, that she needs his help, and that if the laws were changed and he could get her back, he would help her. These statements were made to several persons, including employees of a railroad company where Mr. Dickson and several of Mrs. Dickson's relatives work. The envelopes in which he sends support checks carry a stamp advocating the abolition of divorce, and on the checks themselves, he indicates that the divorce is null and void because he has started a lawsuit. More than once he has come to her house, and when she went inside, he shouted loud enough for the neighbors to hear that she was insane and needed him. In a letter he sent to her, he said that he had written to her employer. One of the most harassing acts has been his insistence to several persons that Mrs. Dickson is still his wife.

Many of the things he did were naturally very upsetting to Mrs. Dickson and threatened her emotional health. It would be naive to assume that Mrs. Dickson's unhappiness did not have a harmful effect upon Michelle and Philip and on Mrs. Dickson's ability to raise them. The effect upon their mother could not help but embitter the children toward their father.

Moreover, much of Mr. Dickson's conduct directly threat-

ened their welfare. He has stated to several persons that the children, as well as Mrs. Dickson, need help and that if she would marry him again, he could help them. On one occasion he passed out literature at their church, at which several persons laughed. This occurrence was related to a couple of Mrs. Dickson's older children. These incidents could not have escaped the younger children's attention. The disparaging remarks about or reflecting on them could very well make them think badly of themselves and their family. They have undoubtedly heard of Mr. Dickson's statements that Mrs. Dickson is still his wife. In Michelle's mind especially, remarks about her mother's health and relationship with her ex-husband, at the least, would create much confusion. More likely, it may lead to questioning of her mother's judgment and her mother's conduct, such as seeing other men. The statements could easily discourage possible suitors for Mrs. Dickson. Moreover, by saying that she is still his wife, Mr. Dickson is falsely implying that he still has some right to custody and control of the minor children other than visitation rights.

That Michelle has or will become aware of this conduct is shown by the fact that both of her siblings still at home, Pamela and Philip, have become involved. Pamela testified that people were aware of Mr. Dickson's conduct and associated her with him at church, school and social functions. Philip testified that his friends all knew of his father's activities through their parents, though none of the information involved him directly.

■■ Clearly, then, the trial court had jurisdiction to impose an injunction to protect the welfare of the minor children. However, because the court no longer has jurisdiction to affect the rights of the parties once the children reach majority, the injunction must be modified to terminate when the youngest child reaches majority.[2] *Hughes v.*

---

[2]We recognize that under the new dissolution act, RCW 26.09.010-.290, a court's jurisdiction in some instances may not terminate when the children of the marriage reach majority. *In re Marriage of Melville,* 11 Wn. App. 879, 526 P.2d (1974); RCW 26.09.100; RCW

*Hughes,* 11 Wn. App. 454, 524 P.2d 472 (1974). Any injunctive relief to which Mrs. Dickson may be entitled after that time is not before us and must be sought in an independent action on the basis of the circumstances existing at that time. In addition, the phrase "from representing Mrs. Dickson as his wife" must be modified to reflect the fact that it does not restrain Mr. Dickson from contending that she is his wife in the eyes of God, that according to the tenets of his religion, she is still his wife, or that because of his religious views he does not recognize the validity of the divorce. To state his religious beliefs in this respect is his right under the free exercise of religion and free speech clauses of the First Amendment. He may not, however, unqualifiedly represent that she is "his wife" or that she is his legal wife.

Mr. Dickson also contends that he is no longer liable for the support of Philip. The petition to increase the original award, he argues, created a new proceeding, in which the new age of majority act must be applied. Since this act reduces the age of majority to 18 years of age, Philip, having reached that age, is no longer entitled to support. Therefore, the argument goes, the rule of *Baker v. Baker,* 80 Wn.2d 736, 498 P.2d 315 (1972)—that the new act does not affect decrees entered before August 1, 1971—does not govern here. We need not reach this issue in the case before us. Mrs. Dickson withdrew her request for an increase in the award for Philip at trial. Since the withdrawal was accepted by the trial court without objection from Mr. Dickson, no new proceeding was conducted as to Philip. Arguably, Mr. Dickson's reasoning would have some validity in relation to the petition for an increase in the award to Michelle. However, no assignment of error having been made to this increase, the issue is not before us.

---

26.09.170. However, *In re Marriage of Melville* and these sections of the act deal only with the support of a minor child, and not with custody or protection of a minor child's welfare. Moreover, the judgment in the case at bar was entered on January 9, 1972, 1 year before the new act was effective.

Affirmed as modified. Respondent shall be awarded costs on appeal.

PEARSON, C.J., concurs.

PETRIE, J. (dissenting)—I am compelled in conscience to disagree respectfully with some of the views expressed in the majority opinion and to dissent therefrom. There is a fine line of distinction between my views and the views of the majority, which the judicial system must recognize and preserve.

The only portion of the trial court's permanent injunction from which Mr. Dickson seeks relief in this court is that which prohibits him from representing that Mrs. Dickson is his wife. This relief has been sought on the basis—as I understand it—that he adheres to the religious conviction that neither the State of Washington nor any other power on earth, civil or ecclesiastical, has the authority to truly dissolve the marriage relationship, which he believes was contracted between Mrs. Dickson and himself when they were sacramentally married many years ago. He acknowledges that legally he and Mrs. Dickson are divorced and that she is no longer his legal wife. Thus, he acknowledges that the civil decree of divorce, granted by the State of Washington through its judicial system, does have a serious and controllable effect upon the external aspects of the marital relationship between these two parties, but he steadfastly maintains that the decree does not and cannot affect the fundamental relationship which was created when he and Mrs. Dickson were validly married. Incidentally, the record does not reflect that Mrs. Dickson holds to any contrary view.

Mr. Dickson is a scoundrel. I do not for one moment condone any of his past actions which have in fact harassed Mrs. Dickson. Nevertheless, he is entitled to such protections as are afforded by the constitution. Preliminarily, it should be stated that he does not seek to modify the portion of the permanent injunction which permanently enjoins

him from harassing her "in any way"; from "contacting, speaking to or communicating with [Mrs. Dickson] or otherwise interferring [*sic*] with her freedom and personal enjoyment," or "from accusing her of being insane." However, I would most certainly stay the chancellor's hand from imposing the broad restraints set forth in this modified injunction.

The majority opinion grants nothing more than token acknowledgement that Mr. Dickson has the right to express his religious beliefs. Because of the continued viability of the unchallenged portion of the injunction—that he may not harass Mrs. Dickson in any way—I must assume that the continuation of restraints on his future speech applies even though his statements are neither intended to nor do not in fact harass Mrs. Dickson. Thus, under the terms of the injunction as modified, he may never unqualifiedly express his belief to anyone at any time during the life of the injunction even though that assertion is not intended to nor does it harass Mrs. Dickson. Indeed, under any factual circumstances, however far removed from any semblance of harassment of Mrs. Dickson, the injunction leaves suspect the simple assertion, "I believe she is my wife," or "Conscientiously, I must declare that she is my wife." Either he may make those statements, or he may not make those statements. If he may make either of those statements without risking the wrath of the chancellor then there is no reason why he may not express that belief by declaring, "She is my wife." If he may *not* make either of those statements, then he is being deprived of rights guarantied to him by the First Amendment.

One final word. The majority opinion itself appears to acknowledge that the challenged portion of the injunction cannot be supported on the theory of defamation. Certainly, it cannot be said that every future assertion by Mr. Dickson that he regards Mrs. Dickson as his wife will characterize her, in the words of the majority, "as a loose woman, as adulterous, or as bigamous." Granted that defamatory statements are not protected by the First Amend-

194

ment. Neither can they provide the basis for imposition of injunctive relief.

The fundamental error of the majority opinion is that it presupposes that because Mrs. Dickson has been harassed in the past by Mr. Dickson's conduct, every future expression of his belief that she is his wife also will constitute an unwarranted harassment and, somehow, an invasion of her privacy.

With utmost respect for the views and sensibilities of my two associates who have signed the majority opinion— both of whom I hold in the highest esteem—I view the purported exercise of authority now sanctioned by this court as a most flagrant usurpation of judicial authority.

For the reasons asserted herein, I dissent from the opinion of the majority of this court.

Petition for rehearing denied January 6, 1975.

Review denied by Supreme Court February 25, 1975.