**Ana MALDONADO, Appellant,**

**v.**

**Julio MALDONADO, Appellee.**

**No. 93–FM–199.**

District of Columbia Court of Appeals.

Argued June 22, 1993.
Decided Sept. 13, 1993.

Laura A. Foggan, with whom Catherine R. Crystal, Washington, DC, and Vicki L.

Robinson, Alexandria, VA, were on the brief, for appellant.

Josselin Saint-Preux, Alexandria, VA, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and KING, Associate Judges.

KING, Associate Judge:

On January 30, 1992, the trial court issued a Civil Protection Order ("CPO") at the request of appellant ("wife") against her husband, the appellee. In January 1993, the wife's motion to extend the CPO for a period of one year was denied. This appeal followed. We reverse and remand.[1]

I.

In January 1992, the wife sought a civil protection order because of the husband's abusive behavior which included beatings with the hands, a belt, a thick cable, threats with a gun, and other physical force which on at least one occasion caused the wife to lose consciousness. The abuse culminated in a severe beating on January 13, 1992, which required hospital treatment. Thereafter, the wife and the couple's two daughters went into hiding. In order to provide protection for herself and her daughters, the wife obtained, on January 17, 1992, a Temporary Protective Order which expired after fourteen days. A hearing on her request for a CPO, which could be in effect for up to one year, was scheduled for January 30, 1992. On that date the husband consented to the issuance of a CPO to expire on January 30, 1993.

The court approved the CPO which provided that: 1) the husband shall not molest, assault or in any manner threaten or physically abuse the wife; 2) the husband shall stay away from the wife's home, person, work place, and children's school; 3) the husband shall not telephone the wife; 4) the husband shall relinquish possession and/or use of the wife's pocketbook, wallet, working permit, ID card, bank card, Social Security card, passport, and any other items of the children's personal belongings, table, four chairs and dishes; 5) the wife be awarded temporary custody of the minor children; 6) the husband shall have no rights of visitation with the children until the expiration of the order or until further order of the court; 7) the Metropolitan Police Department shall accompany the wife to 542 Irving Street, N.W., Washington, D.C., for the purpose of assisting the wife while she removed the items listed above and to prevent violence between the wife and the husband; 8) the husband shall pay child support in the amount of $523 per month—during the month of February 1992, the husband shall pay $400 toward this obligation ($200 on 2/3/92 and $200 on 2/15/92); beginning March 15, 1992, and every 15th thereafter, the husband shall pay $523 plus any arrearage owed from the month of February—and 9) the husband shall not withdraw the application for permanent residence that he had filed on behalf of the wife.[2]

Meanwhile, in a separate criminal proceeding, the husband was indicted for armed assault with intent to kill, threats, and obstruction of justice for conduct which arose from one of his attacks on the wife. The husband subsequently pleaded guilty in that case, and on December 30, 1992, Judge Wolf imposed an aggregate sentence of not less than two years and not more than eight years. The husband began serving that sentence immediately.

On December 21, 1992, the wife moved to extend the CPO which was scheduled to expire on January 30, 1993. The motion alleged that the husband violated the CPO on a number of occasions, including: waiting for the wife outside her place of employment and attempting to induce her to allow him to see the children; approaching

---

1. The wife complains in her brief that virtually none of the facts contained in appellee's brief have record support. We agree. Appellant did not move to strike appellee's brief and we will not take such action on our own. The facts set forth in this opinion were taken from the record and to the extent that the facts contained in appellee's brief conflict with or add to the record, we reject them.

2. This provision relates to the wife's status as an alien.

the children and their babysitter outside of the school; and approaching the wife and one of the children as they were walking down the street. Prior to the hearing the husband consented to and signed an extended CPO which contains terms substantially the same as those set forth in the CPO which was scheduled to expire January 30, 1993.[3]

The wife's request for an extension came before Judge Wolf for a hearing on January 26, 1993, with the husband, the wife, and the latter's attorney all being present. The trial judge, noting that since the husband was serving a prison sentence he would not be able to physically assault the wife, concluded that no CPO would be necessary: "I don't think there's good cause when he's locked up." Accordingly he denied the motion to extend. We hold that the trial judge erred in so doing.

## II.

■ Under the Intrafamily Offenses Act, a CPO may be extended "for good cause shown." *See* D.C.Code § 16–1005(d) (1989).[4] The determination of good cause is committed to the sound discretion of the trial court which is subject to reversal only upon a showing of abuse of that discretion. *See Cruz–Foster v. Foster*, 597 A.2d 927, 931–32 (D.C.1991); *Johnson v. United States*, 398 A.2d 354, 362 (D.C.1979). This case presents the issue of whether the trial court abused discretion by denying an extension of a CPO solely because the respondent was serving a sentence which, unless modified, would apparently not result in release on parole until after the date the extended CPO would itself expire.[5] We conclude that, under the circumstances, the husband's incarceration was a factor which may and should have been considered by

the trial judge; however, that factor may not be the sole determinate as to whether the CPO should or should not be extended. *See Cruz–Foster, supra,* 597 A.2d at 928 (remanding to permit trial judge to take into account the effect a stay-away order, in a criminal case involving the same two parties, could have upon the question of whether the CPO should be extended). In relying upon the husband's incarceration as the sole basis for denying the extension of the CPO, the trial judge abused his discretion. *See In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991) (trial court abuses its discretion when it rests its legal conclusion on incorrect legal standards).

■ The Intrafamily Offenses Act is a remedial statute and as such should be liberally construed for the benefit of the class it is intended to protect. *See Cruz–Foster, supra,* 597 A.2d at 930; *United States v. Harrison,* 149 U.S.App.D.C. 123, 124, 461 F.2d 1209, 1210 (1972). Here the wife sought an extension that would have preserved the custody status of her children, required the husband to pay regular child support, and ordered the husband not to telephone the wife and not to molest, assault or in any manner threaten or physically abuse the wife or her children. The proposed extension also required the husband to stay away from the wife's home, work place, and the children's schools. Only the latter directive would be fully rendered moot by the husband's incarceration and that would be so only if the sentences imposed in the criminal case assured that the husband remained in custody around-the-clock throughout the duration of any extended CPO. We are not persuaded that such necessarily would be the case.

---

3. Certain provisions in the original CPO had become moot and therefore were not included in the extended CPO.

4. It provides: "A protection order issued pursuant to this section shall be effective for such period up to one year as the Family Division may specify, but the Family Division may, upon motion of any party to the original proceeding, extend, rescind, or modify the order for good cause shown."

5. During the hearing on the motion to extend the CPO, counsel for the wife represented that, with good time credits, the husband would be eligible for parole on July 25, 1994. The trial judge then observed that appellant could be released to a half-way house six months before that date, i.e., January 25, 1994.

For a variety of reasons, we cannot conclude with certainty that the husband would remain incarcerated through January 30, 1994—the expiration date for the requested extended CPO. The wife proffered to the trial judge that the husband could be eligible, if certain events were to occur, for a furlough program that could result in some form of release as soon as one year after the service of sentence began. The husband was sentenced on December 30, 1992. Thus one year later— December 1993—would be one month before the expiration date of the requested extended CPO. Indeed the twelve month waiting period might expire even earlier than December 1993, since appellant was held in lieu of bond for a period of time before he was sentenced, and he is entitled to credit on his sentence for the time served before he was sentenced. *See* D.C.Code § 24–431(a) (1989). Whether the credit for time served before sentencing would also shorten the twelve month period before appellant might be eligible for the furlough program is unknown; however, the uncertainty on that point should have put the trial judge on notice of the possibility that the husband might be at large sooner than anticipated.

Furthermore, as the trial judge himself recognized, appellant could be released to a half-way house as early as January 25, 1994—five days before the expiration of the requested extended CPO. *See supra* note 4. Whether appellant would in fact be paroled when he was first eligible, and whether, if paroled, he would be placed in a half-way house at the earliest possible date, is far from certain. The possibility of this occurrence, however, cannot be ignored. Finally, appellant is incarcerated at a nearby facility and if he were to escape he would likely be able to locate the wife and their children if he wished to do so. A CPO, of course, does not guarantee protection under those circumstances; however, that is not the standard for its issuance. Rather, its existence serves as a potential deterrent and provides a measure of peace of mind for those for whose benefit it was issued.

Moreover, with respect to the portion of the original order barring threats directed at the wife and children and the telephoning of the wife, the wife would be left open to harassment or threatening communications from the husband should he gain access to a telephone. In addition, threats can be communicated by mail or through third parties. Although threats to commit physical harm by one incarcerated may, in some instances, not rise to the level of seriousness that physical abuse does, such conduct nonetheless can have significant adverse affects upon the victim. Congress recognized that reality in 1968 when it provided that a threat to injure the person of another is punishable for a term of up to twenty years. *See* D.C.Code § 22–2307 (1989). At a minimum, the wife is entitled to be free of abuse or threats by the husband whether committed by telephone or the mail. Further, although the husband has apparently acted in person in his previous assaults upon the wife, during the period he is incarcerated he could act through others to molest or assault her or the children. Again, although a CPO does not guarantee that such conduct will not occur, it nonetheless serves as some deterrent. Thus, we conclude that even if the husband remained incarcerated, that circumstance would not prevent him from engaging in conduct, either alone, through others, or both, that would be barred by the CPO if it had been extended.

In addition, we note that there are other factors that should be taken into account. For example, the original CPO gave the wife custody of the children and the proposed extended CPO would have preserved that status. By allowing the original CPO to expire, the children's status is left in some doubt although, in light of the husband's incarceration, no immediate conflict would appear to be present.[6] The child

---

6. At the hearing on the motion to extend, the wife's counsel informed the court that a separate custody and support action had been filed but that it had not yet been resolved. The trial judge could have consolidated the domestic relations matter with the CPO action as requested by the wife. *See D.C.Code § 16–1004(a) (1989)* (trial court shall, where appropriate, consolidate

support payments previously ordered, however, were no longer required once the CPO expired. The husband admitted in the hearing that he expected to receive some $3800 that was owed to him. Those funds could be used to support his children while he is incarcerated. The trial judge discounted that possibility because the sum would not have been sufficient to provide all the child support ordered during the period the husband would be incarcerated (i.e., at .$523 per month, $3800 would be exhausted in less than eight months), and the husband would necessarily have fallen in arrears. That may be so, but the $3800, or a portion of that sum, would doubtlessly have been a welcome and needed addition to the funds available to the wife for the children's support. After the $3800 was expended (together with other funds, if any, the wife claims the husband was due to receive) a motion by the husband to suspend payments until after the end of his incarceration might have been favorably considered. Thus, in addition to considering the potential threat the husband posed if released early or while he was incarcerated, the trial judge should have given further consideration to the effect termination of the CPO would have upon child support payments. We do not suggest that an interest in continuing child support payments alone necessarily would have been dispositive on the question of whether the CPO should be extended. Rather, it is a factor that must be taken into account, along with others, in making that determination.

■ Finally, the husband consented to the extension of the CPO. Although the trial court made no findings concerning the voluntariness of that consent, the inquiries made of the husband by the trial judge suggest that the husband was freely agreeing to the extension. We believe the purpose of the statute is served by encouraging respondents' consent to these agree-

the CPO proceeding with "other matters before the Family Division involving members of the same family"). At minimum the trial judge could have considered extending the custody and support provision of the CPO until resolution of those issues in the separate proceeding.

ments. *See* Super.Ct. Intra–Fam.R. 11(b). We think, therefore, that if the consent is voluntary a trial judge ordinarily should issue the CPO when requested. *See United States v. City of Jackson,* 519 F.2d 1147, 1151 (5th Cir.1975) (court should approve consent decree so long as its terms are not unlawful, unreasonable, or inequitable); *see also Moore v. Jones,* 542 A.2d 1253, 1254 n. 1 (1988) ("[c]ourt approval of a consent decree means the court has concluded that the terms of the decree are not unlawful, unreasonable, or inequitable"). If the trial court declines to issue a CPO freely consented to by a respondent, we believe that a strong statement of reasons for not doing so should be set forth. Here, the trial judge gave no reason for declining to accept the respondent's agreement to be bound by the extension of the CPO, and we conclude for that reason and the other reasons set forth above that he abused his discretion. Accordingly, we reverse and remand for further proceedings on the wife's motion to extend the CPO.

*Reversed and remanded.*

SCHWELB, Associate Judge, concurring in the judgment:

The parties tendered a proposed consent decree extending the CPO to the trial judge for his signature. In my opinion, there was no basis whatever for any finding that the decree was unlawful, unreasonable or inequitable, and the judge made no such finding. No claim was made by Julio Maldonado that his consent was coerced or involuntary.[1]

Under these circumstances, I perceive no basis for the judge's refusal to sign the consent order. *Moore v. Jones,* 542 A.2d 1253, 1254 n. 1 (D.C.1988). To the extent that the judge was exercising his discretion, that exercise was flawed as a result of his failure to apply the correct legal standard. *In re J.D.C.,* 594 A.2d 70, 75 (D.C.

1. In fact, Mr. Maldonado had little if any reason to object to the extension of the CPO. He would be in prison during all or most of the time that it would be in effect. Its potential impact on his life would obviously be significantly reduced by the reality of his incarceration.

1991). In my view, that is all we need to decide, and I would be disinclined to go further.

We are dealing here with the extension of an injunction. *Cruz–Foster*, 597 A.2d 927, 931 (D.C.1991). Although we construe the remedial CPO statute generously, *id.*, I have reservations, absent Julio Maldonado's consent, about any suggestion that such hypothetical developments as Mr. Maldonado's possible future escape from prison, or his possible release a few days before an extended order would expire, would be sufficient to require the judge to extend the CPO.[2] *See, e.g., Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931) (an "[i]njunction issues to prevent existing or presently threatened injuries. One will not be granted against something feared as liable to occur at some indefinite time in the future"); *Wisconsin Gas Co. v. F.E.R.C.*, 244 U.S.App.D.C. 349, 354, 758 F.2d 669, 674 (1985) (same).[3]

We recently reiterated our unwillingness, in the exercise of judicial restraint, to address or decide difficult questions before we are obliged to do so. *See District of Columbia v. Wical Limited Partnership*, 630 A.2d 174, 181–182 (D.C.1993), and authorities there cited. Given the dispositive presence in this record of Julio Maldonado's apparently unconstrained consent, I would not explore issues which would meaningfully arise only if he had not consented. Accordingly, I concur in the judgment but respectfully decline to join the court's opinion.

---

**2.** For similar reasons, I would not explore on this appeal the question whether the possibility that Julio Maldonado might be able or disposed to make threatening or otherwise inappropriate telephone calls from prison would have been sufficient to warrant extension of the order over his objection.

**3.** I do not suggest that the standards articulated in these cases and others like them should be applied uncritically to the CPO context. *Cf. Cruz–Foster, supra*, 597 A.2d at 931. The difficulty of the questions presented, however, reinforces my view that we ought not to confront them until we have to.