**Delores Floyd BURWELL, Appellant,**

v.

**Homer Stanley BURWELL, Appellee.**

**No. 95–FM–698.**

District of Columbia Court of Appeals.

Argued April 23, 1997.

Decided Sept. 4, 1997.

---

Richard Potter, law student, with whom Michael McGonnigal, Supervising Attorney, Washington, DC, and Patrice Mulkern, Townsend, MA, law student, were on the brief, for appellant.

Deborah G. Matthews, law student, also entered an appearance for appellant.

James E. Drew, Washington, DC, for appellee.

Before WAGNER, Chief Judge, FERREN, Associate Judge, and KERN, Senior Judge.

PER CURIAM:

Delores Floyd Burwell appeals from the trial court's order granting her an absolute divorce from Homer Stanley Burwell and dividing the marital property. Mrs. Burwell challenges the trial court's decision to order the sale of the marital home and an equal division of the proceeds between husband and wife. She contends the trial court erred in applying a presumption of *equal* distribution of the marital property and in failing to consider the statutory factors on which an *equitable* distribution must be based. Mrs.

Burwell also argues that the court erred in failing to address her request for a permanent stay away order to protect her from her husband. We agree with Mrs. Burwell on both counts, reverse the trial court's order, and remand for further proceedings.

## I.

### A.

Mrs. Burwell and Homer Stanley Burwell were married in Alexandria, Virginia, on November 5, 1970. At the time of the marriage, Mr. Burwell and his brother, Harold Burwell, owned a house at 3632 11th St., N.W., where Mrs. Burwell has lived from the beginning of the marriage. In 1972, Mr. Burwell and his brother conveyed the property to Mr. and Mrs. Burwell as tenants by the entireties. The house became marital property at this point, although it was encumbered at the time by a mortgage that was not paid off until 1979.[1]

Almost from the inception of the marriage, Mr. Burwell did not reside at the marital home in Washington. He went to St. Louis, Missouri, where he owned property and had a job as a contractor that required him to travel in that area. Mrs. Burwell went to St. Louis but stayed for no more than a couple of months before returning to Washington. From 1971 until 1975, Mr. Burwell lived in St. Louis with his mistress, Eleanor Mitchell. While Mr. Burwell was away, Mrs. Burwell was primarily responsible for maintaining the family home and paying the mortgage and other household expenses; Mr. Burwell provided only sporadic financial assistance. On December 6, 1975, Mr. Burwell killed Mitchell; he was acquitted of murder when the jury accepted his theory of self-defense. After the trial, Mr. Burwell returned to Washington and moved back into the marital home with his wife.

Mr. Burwell lived with his wife until March 1, 1983, when he moved into the Washington home of another mistress of his, Mamie McQuarter. Mr. Burwell took out another mortgage on the marital home on May 5, 1983, in the amount of $22,000. Mrs. Burwell testified that she had been coerced into signing the loan papers because Mr. Burwell had said he wanted the money and had threatened to go out and shoot everyone he saw with a machine gun if she did not sign. Mr. Burwell denied threatening his wife,[2] but testified that he had "had a mortgage put on the house," that the mortgage was "foolish," and that he "did it through anger" with Mrs. Burwell. The monthly mortgage payments at the time of the divorce trial were $314.

On December 16, 1984, Mr. Burwell shot and killed his mistress, Mamie McQuarter. He pled guilty to second-degree murder and to carrying a pistol without a licence, and he was sentenced to a prison term of 11 years, 4 months to 34 years.[3] He was still in prison

---

1. The trial court's order included the following finding:

 > [T]he home having been Mr. Burwell's home with his brother prior to the marriage[, he] could have created or could have maintained that house as separate [i.e., non-marital] property without her participation[, and] simply by his activities [he] produced a house free and clear of debt for Mrs. Burwell to live in.

 This finding inaccurately suggests that the property was not encumbered by debt when title was transferred to the parties as tenants by the entireties. Mrs. Burwell testified, without contradiction, that there was a mortgage on the house when she moved in, and that she was responsible for paying that mortgage because she could not rely on Mr. Burwell for financial assistance. Mrs. Burwell introduced a copy of the mortgage note in evidence. That note was issued in 1965 and apparently assumed by Mr. Burwell in 1969 when he and his brother acquired the property. The note reflects an original principal of $4,500, and was paid in monthly installments of $40 until satisfied in full in 1979. The trial court's finding also ignores the substantial mortgages on the property that were obtained after the marriage and paid off largely by Mrs. Burwell. Finally, the finding speculates about what Mr. Burwell "could have" done, instead of focusing solely on the facts actually proved at trial.

2. The trial court did not credit Mrs. Burwell's testimony that she had been coerced into signing this mortgage. The trial court did not expressly credit or reject her testimony that Mr. Burwell alone received the proceeds from the mortgage loan.

3. Mrs. Burwell's brief states that Mr. Burwell's sentence was 11 to 33 years. The sentencing order, which Mrs. Burwell introduced in evidence, however, indicates that Mr. Burwell was sentenced to 11 to 33 years on the murder count, to run consecutively to a one-year sentence on the firearm count.

at the time of the trial. Mr. Burwell previously was granted a medical parole, but that parole was revoked—before he was released—when Mrs. Burwell objected and presented evidence of threats Mr. Burwell had made against her. Mr. Burwell's release date has not been set, although parole documents in the record indicate that he will not come up for a rehearing on parole until June 1999.

Mrs. Burwell has been responsible for making all the mortgage and utilities payments for the house while Mr. Burwell has been incarcerated. She also was primarily responsible for making these payments before Mr. Burwell murdered his mistress, since he was not living at home and provided only sporadic financial assistance.[4] Mr. Burwell built a three-room addition to the house before he went to prison and gave Mrs. Burwell approximately $5,500 he inherited from his aunt to help with her expenses while he was serving his sentence. At about the same time, Mrs. Burwell had to have the roof replaced on the house and porch at a total cost of $6,315. Mrs. Burwell also spent $1,600 to have a security system installed in the house, because of her fear of living in an unsafe neighborhood.

Mrs. Burwell was in very poor health at the time of the trial, as she had been for several years; she suffered from rheumatoid arthritis, an enlarged heart, bleeding ulcers, a physical deformity that impeded her walking, and she was legally blind. She was unable to cook meals or to get around very much and thus relied on junk food and assistance from neighbors and relatives. She received a disability check of $620 a month, of which $314 immediately went to paying the mortgage on the house. Mr. Burwell suffered from asthma, from broken heels that curtailed his activities, and from various maladies primarily relating to old age. Even though he was seventy-four at the time of trial, he indicated in letters to his wife that he hoped to work in some kind of supervisory position upon his release from prison. He added that he had a job awaiting him at $20 per hour, or about $800 per week, and that he would continue to be housed in prison where he would have to pay the authorities only $10 per week. Mr. Burwell also owned real property in St. Louis which he acquired before the marriage. Because Mr. Burwell was incarcerated at the time of trial, he had no living expenses.

At the divorce trial, Mrs. Burwell testified that she was terribly frightened of Mr. Burwell because of his history of violence and because of letters he had sent to her which she found threatening. She was afraid he would retaliate for her failure to cooperate with the prison authorities to help him obtain his release on medical parole. She asked that the marital home be awarded entirely to her so that she could sell it and have enough money to purchase a small condominium in a safer neighborhood where Mr. Burwell would be unable to find her. She also requested that "[t]he court order [Mr. Burwell] not to molest, assault or threaten [her], to stay away from [her] home and person and to refrain from contacting her in any way, including by telephone or in writing."

**B.**

█ The trial court ordered the sale of the marital home and an equal division of the net proceeds between Mr. Burwell and Mrs. Burwell. Because we ultimately conclude that the trial court's reasoning was inadequately explained to facilitate appellate review, we believe it is important to quote the trial court's reasoning in full. After recounting a shortened version of the factual background we have provided above, the court concluded:

> The defendant [Mr. Burwell] contributed to the house through construction (adding 3 rooms) and maintenance up and until he was incarcerated. Said contribution equals the [plaintiff's[5]] monetary contribution.

---

4. Mrs. Burwell also paid most of a consumer loan for $5,000, taken out in 1984. The trial court neither credited nor rejected her testimony that she was coerced into co-signing for this loan by Mr. Burwell's threats to burn down the marital home. The court also did not indicate whether it credited her testimony that she received none of the proceeds from this loan.

5. The court's order contains an obvious typographical error in that it uses the word "defendant's" instead of "plaintiff's" here. According

The Court finds that the plaintiff's demand for 100% distribution of the marital property to her because [of] the defendant's limited contribution to the upkeep of the house since his incarceration, his limited contribution to the household prior to his incarceration[, h]is multiple infidelities during the course of the marriage, his failure to adequately provide for his spouse during his incarceration and her having maintained the premises paying the $5,000.00 consumer loan, the cost of replacing the tin roof and the payment to maintain the mortgage current during his absence does not destroy his equal interest in the property.

The Court finds that the home having been Mr. Burwell's home with his brother prior to the marriage could have created or could have maintained that house as separate property without her participation simply by his activities produced a house free and clear of debt for Mrs. Burwell to live in. A home that she lived in during the time that he was away from jurisdiction in St. Louis with his financial assistance and that only his incarceration terminated his financial participation in the maintenance of the house since 1987.

Therefore, the marital property should rightfully and equitably be divided 50% to each party. There are no other property rights to consider.

The trial court made no mention in its oral or written findings of Mrs. Burwell's request for a stay away order as part of the divorce decree.

Mrs. Burwell filed a timely notice of appeal. She argues on appeal that the trial court applied an improper presumption of an equal distribution of marital property, and that the court also failed to consider all the statutory factors applicable to dividing marital property. She further contends that the trial court's failure to respond to her request for a stay away order requires a remand for trial court consideration of that issue.

## II.

 A trial court undoubtedly has "broad discretion" to order a distribution of marital property. *See, e.g., Pimble v. Pimble,* 521 A.2d 1173, 1174 (D.C.1987) (per curiam). The divorce law contains no presumption in favor of an equal distribution of property; instead, it requires the court to divide the marital property "in a manner that is equitable, just and reasonable," after considering "all relevant factors including, but not limited to," those detailed in the margin.[6] D.C.Code § 16–910(b) (1997 Repl.). If the trial court fails to consider all the relevant factors, we cannot determine whether the court properly exercised its discretion and achieved an equitable result. *See, e.g., Pimble,* 521 A.2d at 1174–75. We have, therefore, repeatedly reversed divorce decrees or-

to the court's oral findings, which roughly correspond to the subsequently entered written findings: "Said contributions equal the plaintiff's monetary contributions since his incarceration."

The trial court concluded its written order with the following statement: "The above together with any oral opinion rendered from the bench ... constitutes the Court's Finding of Fact and Conclusions of Law and Judgment pursuant to Super. Ct. Dom. Rel. R. 52." We note that this proviso does not comply with Super. Ct. Dom. Rel. R. 52(a), which requires "written findings of fact, [and] separate conclusions of law." The trial court cannot simply incorporate oral findings within its written order in the hope of covering anything that was left out. Indeed, the comment to the rule states it was amended specifically to remove the provision permitting oral findings that were stenographically recorded. *See* Super. Ct. Dom. Rel. R. 52 cmt. On appeal, we therefore review the court's written findings of fact and conclusions of law; we cite the

court's oral findings only to buttress our conclusion that the written order contains a typographical error.

6. D.C.Code § 16–910(b) includes the following nonexclusive enumeration of factors relevant to the court's distribution of marital property:

the duration of the marriage, any prior marriage of either party, the age, health, occupation, amount and sources of income, vocational skills, employability, assets, debts, and needs of each of the parties, provisions for the custody of minor children, whether the distribution is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition of assets and income. The court shall also consider each party's contribution to the acquisition, preservation, appreciation, dissipation or depreciation in value of the assets subject to distribution under this subsection, and each party's contribution as a homemaker or to the family unit.

dering distribution of marital property where, as here, the inadequate findings on material issues precludes meaningful appellate review. *See, e.g., Joel v. Joel,* 559 A.2d 769, 772–73 (D.C.1989); *Pimble,* 521 A.2d at 1174–75; *Bowser v. Bowser,* 515 A.2d 1128, 1130–33 (D.C.1986); *Leftwich v. Leftwich,* 442 A.2d 139, 143 (D.C.1982).

The trial court's reasoning, quoted in full in Part I.B., falls short of the requirement that the trial court "must present an integrated, internally consistent and readily understood whole." *Bowser,* 515 A.2d at 1130. After listing all of Mr. Burwell's failures to contribute to the marriage and to the preservation of the marital home, the court concluded that these considerations "do[ ] not destroy his equal interest in the property." We agree with Mrs. Burwell that the trial court appeared to employ, at some stage in its reasoning, a presumption of equal distribution which Mrs. Burwell was required to overcome in order to receive a greater percentage of the proceeds from the sale of the house. The idea that Mr. Burwell had an "equal interest in the property" may arise from the trial court's previous statement that Mr. Burwell's contributions to the house "equal[led] the [plaintiff's] monetary contribution." Or, the court simply may have started its analysis with a presumption of an equal distribution that was not rebutted. Either approach is inconsistent with the statutory scheme and this court's precedents.[7]

The court must engage in a comprehensive assessment of *all* relevant factors before arriving at an equitable distribution of property. *See Bowser,* 515 A.2d at 1130. The court cannot start with a presumption of equal distribution and demand that one party produce evidence sufficient to "destroy" the other party's "equal interest in the property."

Even putting aside the court's apparent use of an improper presumption of equal distribution, the court's order cannot be sustained. The trial court failed to consider several of the specifically enumerated statutory factors, about which there was record evidence and which have an important bearing on deciding what constitutes an equitable distribution of the marital home in this case. The court did not mention the parties' health and respective financial circumstances. *See* D.C.Code § 16–910(b) (quoted *supra* note 6). The evidence suggests that Mrs. Burwell was in far worse physical condition than Mr. Burwell. Mrs. Burwell's only income, moreover, was a disability check, more than half of which was consumed by the mortgage on the house. She had no assets (other than the marital home) and no prospect of employment or other income. Mr. Burwell, on the other hand, had an interest in non-marital real property located in Missouri, no expenses while he was in prison, a long history of gainful employment, and, according to his own testimony and correspondence with his wife, significant prospects for employment, despite his age, upon his release from prison. In short, we do not understand how the trial court could arrive at an equitable distribution of the marital estate without considering the overall financial statuses, respectively, of Mr. and Mrs. Burwell. *See Leftwich,* 442 A.2d at 143 (remanding for further factfinding where "trial court expressly focused on just the husband's financial contributions to the acquisition of the marital property, without regard to any contributions by the wife or the fact that she was markedly less able to acquire assets given the parties respective earning capacities").

The trial court also failed to consider in any meaningful way Mr. Burwell's long histo-

---

7. The court's findings suggest that, because Mr. Burwell and his brother could have elected not to convey the property to Mr. Burwell and his wife as tenants by the entireties, Mr. Burwell should be deemed to begin with a fifty percent interest, derived, presumably, by reference either to his own original half interest or to the two one-quarter interests he and his brother conveyed, in effect, to each party. Any such analysis is incorrect. By conveying his joint half interest to himself and his wife in a new form of tenancy, Mr. Burwell converted non-marital property into

marital property, just as his brother created marital property with his conveyance of the other half interest to the Burwells. *See Turpin v. Turpin,* 403 A.2d 1144, 1147 (D.C.1979). Once property becomes marital property, it becomes subject to equitable distribution as such in accordance with prescribed statutory factors, including the amount each party contributed to the property, without regard to any legal claim by either spouse based on a prior form of ownership. *See id.*

ry of absence from the District and the marital home, his adulterous relationships, his murder of his mistress, and his allegedly threatening conduct towards Mrs. Burwell, in the context of assessing "each party's contribution ... to the family unit." D.C.Code § 16–910(b); *accord, Pimble,* 521 A.2d at 1174 (remanding because trial court failed to make adequate findings of fact with respect to, among other relevant factors, the "wife's adulterous activities prior to and after her abandonment of [her husband], her family, and home"). While we do not decide how much weight the court should have given to these non-economic factors, we reiterate that the trial court must consider *all* relevant factors in order, to arrive at an "equitable, just, and reasonable" division of assets and for this court to exercise meaningful appellate review. *Dews v. Dews,* 632 A.2d 1160, 1164 (D.C.1993); *Leftwich,* 442 A.2d at 143.

We also are not satisfied with the court's conclusory observation that Mr. Burwell's contribution to the house, by adding several rooms and providing financially for its maintenance before his incarceration, equalled Mrs. Burwell's "monetary contribution." *Cf. Joel,* 559 A.2d at 772 (remanding for further findings where trial court stated simply that wife's non-economic contributions equalled husband's economic contributions and imposed an equal distribution of property). The parties' respective monetary contributions to the property are highly relevant in reaching an equitable distribution of the property. The court's equation of the two sides in this case, without any subsidiary findings to support this conclusion, makes it impossible for us to assess the correctness of the ruling. *See Pimble,* 521 A.2d at 1175. This flaw is particularly significant because of the court's failure to determine whether Mrs. Burwell received any of the benefit from the mortgage loan taken out in 1983 and from the $5,000 consumer loan taken out in 1984—loans, it would appear, she was almost entirely responsible for repaying herself. See *supra* notes 2, 4.

On remand, the court should engage in a precise and conscientious weighing of all relevant factors, statutory or otherwise, before reaching a conclusion about the proper distribution of the property. While we do not foreclose an equal distribution of the proceeds from marital home, the trial court should not begin its analysis with a notion that equal distribution is presumptively equitable or that the previous ruling should be maintained. *See Pimble,* 521 A.2d at 1175.

### III.

Mrs. Burwell also contends that the "trial court failed to address [her] clear request for a permanent stay away order from her violent husband." However, we note that Mrs. Burwell in her complaint requested only that the trial court "rule[ ] that the Defendant can not come within a hundred feet of the Plaintiff." In her amended complaint, Mrs. Burwell requested the trial court to "order the Defendant not to molest, assault or threaten the Plaintiff" and to award "such other and further relief as the nature of the case may require and the Court may deem just and proper." Mrs. Burwell, in response to counsel's question at trial, stated, "I want it so that he don't [sic] come anywhere near me or bother me."

The record reflects that the trial court failed to address Mrs. Burwell's request for relief in either its oral ruling from the bench or in its written order.[8] Therefore, "meaningful appellate review cannot occur" because, although Mrs. Burwell properly raised the issue, the trial court neither addressed nor ruled upon it. *Ealey v. Ealey,* 596 A.2d 43, 46 (D.C.1991). Mrs. Burwell's pleadings appear to request relief falling within the statutory framework for civil protection orders.[9] *See* D.C.Code § 16–1005(c)-(d)

---

8. We reject Mr. Burwell's suggestion that we should infer that the trial court denied the request "sub silentio." We cannot assume that no decision at all by the trial court constituted a ruling of denial of the relief requested, particularly since it is unclear what relief Mrs. Burwell seeks from the trial court.

9. We are aware that Mrs. Burwell's counsel characterized the relief requested in opening and closing argument as a "permanent stay away order." However, we are unpersuaded that counsel's statements altered the nature of the relief requested as framed in Mrs. Burwell's pleadings, or reflected an intent to seek equitable relief in lieu of the statutory remedy.

(1997);[10] *see also Maldonado v. Maldonado,* 631 A.2d 40, 42 (D.C.1993) (reversing and remanding the denial of a wife's request to extend a civil protection order commanding her incarcerated husband "not to molest, assault or in any manner threaten or physically abuse" her or her children). We are therefore unable to agree with our colleague that Mrs. Burwell's request for relief necessarily presents "[t]he question whether a trial court has the power to issue a permanent stay-away order."[11] *See infra* at 228 (Ferren, J., dissenting). We conclude that the trial court should seek clarification from Mrs. Burwell as to the precise nature of the relief she requests and make appropriate findings and conclusions that will enable appellate review if necessary.

"[T]his court must remand the case," and the "trial judge must make findings of facts and conclusions of law" on the issue of the stay away order. *Id.* As a reviewing court, we decline to address and decide this issue until the trial court renders its ruling in the first instance.

\* \* \* \* \* \*

For the foregoing reasons, we reverse the trial court's order and remand the case for further proceedings consistent with this opinion.

*So ordered.*

FERREN, Associate Judge, concurring in part and dissenting in part:

I join Parts I. and II. of the court's opinion. As to Part III., I cannot agree with my colleagues' decision not to address Mrs. Burwell's request for a permanent stay-away order. The majority defers resolution of this issue in the first instance to the trial court, rather than dealing now with the threshold argument raised by Mr. Burwell: that the trial court would have had no authority to grant such an order.[1] I disagree with this procedure. The question whether a trial court has the power to issue a permanent stay-away order presents a pure question of law—fully briefed and argued before this court—which requires no exercise of discretion or factfinding by the trial court to enable its resolution. *See Davis v. United States,* 564 A.2d 31, 35 (D.C.1989) (en banc) ("[W]here the matter under review requires invocation or declaration of a fact free general principle of law, the court will designate the issue as a question of law, and review the matter 'de novo.'"). If the court lacked jurisdiction to enter such an injunction, as Mr. Burwell maintains, we could affirm the trial court's sub silentio denial of Mrs. Burwell's request without a remand. *See Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C.1993) (recognizing that this court can affirm judgment of trial court on grounds different from those relied upon by trial court). I therefore believe that consideration of Mr. Burwell's challenge to the trial court's general authority to issue a permanent no-contact order is a prerequisite to determining whether this case requires a remand for the trial court to address Mrs. Burwell's request.

---

**10.** D.C.Code § 16–1005(c)(3) provides that the judge "may issue a protection order directing, where appropriate, that the respondent avoid the presence of the family member endangered." Section (d) further provides that "[a] protection order issued pursuant to this section shall be effective for such period up to one year ... [but the judge may] extend, rescind, or modify the order for good cause shown."

**11.** The question of the trial court's authority to issue a permanent stay away order first appeared in this case when Mr. Burwell argued as appellee that Mrs. Burwell's request for relief had been denied because the trial court lacks the power to grant permanent relief. For a general discussion of injunctive relief, see generally *Albergottie v. James,* 470 A.2d 266, 270 (D.C.1983) (per curiam) (injunctive relief discretionary); *Ifill v. District of Columbia,* 665 A.2d 185, 187–88 (D.C.

1995) (requiring an inadequate remedy at law for a permanent injunction).

**1.** My colleagues support their disposition of the case by observing that the nature of relief requested by Mrs. Burwell remains unclear. I do not believe the record supports this contention. Mrs. Burwell's opening and closing arguments made clear that she was requesting *permanent* injunctive relief to protect her from her husband. On appeal, moreover, Mr. Burwell does not argue that the parties or the court failed to understand that she was proceeding under the court's general equity powers, and not the statute governing civil protection orders. To the contrary, Mr. Burwell explicitly acknowledges that Mrs. Burwell requested permanent injunctive relief; he argues that the appeal can be denied in light of the unavailability of such non-statutory relief.

A trial court in the family division is authorized by statute to issue, in appropriate circumstances, a Civil Protection Order (CPO) providing for the relief requested by Mrs. Burwell. *See* D.C.Code §§ 16–1001 to –1006. A CPO may be effective for up to one year, and may be extended upon motion for good cause shown. *See* D.C.Code § 16–1005(d). The statute, however, does not authorize the permanent injunctive relief that Mrs. Burwell contends is necessary to protect her from her husband. Mr. Burwell argues that the court therefore, could not have granted a permanent injunction as part of the divorce decree.

I agree with Mrs. Burwell that a trial court, in a proper case, would have the authority under its general equitable powers to issue such a permanent stay away order. I would therefore remand the case to allow the trial court to consider whether, on the facts of this case, such relief is appropriate.

The Alaska Supreme Court reached the same result in *Siggelkow v. State*, 731 P.2d 57 (Alaska 1987), noting that while its parallel statutes governing CPOs "do not themselves authorize the court to issue a [permanent] no-contact order, neither do they ... limit the inherent equitable powers of the court." *Id.* at 61; *cf. Dickson v. Dickson*, 12 Wash.App. 183, 529 P.2d 476, 477–81 (1974) (affirming, as modified, post-divorce injunction including no-contact provision, as within divorce court's equitable power to protect involved minor children); *cf. also Galella v. Onassis*, 487 F.2d 986, 998–99 (2d Cir. 1973) (affirming, as modified, permanent injunction prohibiting photographer with history of harrassing President Kennedy's children and their mother from engaging in any conduct that would reasonably be seen as frightening by mother and her children).

Court decisions in this jurisdiction have not yet addressed whether permanent stay away orders may be issued under the court's general equitable power, either in general or in divorce proceedings in particular. Mr. Burwell argues that we should follow the decisions of Maryland courts, which, he contends, have held that a divorce court's authority to grant injunctive relief is limited to that expressly provided by statute. *See, e.g.,* *Magness v. Magness*, 79 Md.App. 668, 558 A.2d 807, 809–11 (1989); *Kapneck v. Kapneck*, 31 Md.App. 410, 356 A.2d 572, 577 (1976).

Mr. Burwell's reliance on the Maryland cases is misplaced. *Kapneck* noted that, under the then-prevailing statutory scheme, "[i]n divorce proceedings the court sits, not in the exercise of its ordinary equity jurisdiction, but as a divorce court and is governed by the rules of principles established in the ecclesiastical courts in England so far as they are consistent with the provisions of the Maryland Code." 356 A.2d at 576–77 (internal quotation marks omitted). Because ecclesiastical courts had no authority to issue injunctions, the *Kapneck* court held that the trial court, as an equity court hearing a divorce case, lacked the power to issue a no-contact order. *See id.* at 577–78. This jurisdictional defect was quickly cured by the Maryland legislature, which amended the law the following year to provide: "A court of equity sitting in an action for divorce, alimony, or annulment has all the powers of a court of equity, and may issue an injunction to protect any party to the action from physical harm or harassment." Md.Code Ann., Cts. & Jud. Proc. § 3–603(b) (1980) (current version at Md.Code Ann., Fam. Law § 1–203(a) (1991 Repl.)).

In the District of Columbia, by contrast, the Family Division of the Superior Court has had all of the traditional powers of an equity court since its creation by the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (codified as amended at D.C.Code §§ 11–101 to –2504 (1995 Repl.)). *See Poe v. Noble*, 525 A.2d 190, 195 (D.C.1987) (citing cases for proposition that each division of Superior Court shares the same "general jurisdictional grant" of power, including "general equity powers"). The Maryland cases, with their reliance on the limited authority of divorce courts in Maryland, therefore have no application to our courts. This court has long recognized that "[a]lthough [the] Superior Court is separated into a number of divisions, these functional divisions do no delimit their power as tribunals of the Superior Court with general jurisdiction to

adjudicate civil claims and disputes." *Andrade v. Jackson,* 401 A.2d 990, 992–93 (D.C. 1979) (noting that "each division possesses the undivided authority of the [Superior] Court"). The equitable powers of a court in the Family Division of the Superior Court are therefore coextensive with those of a general tribunal sitting in equity.

While the statutory provision defining the exclusive jurisdiction of the Family Division does not mention permanent injunctive relief to protect individuals from harassment and physical harm, *see* D.C.Code § 11–1101, this omission—as elaborated below—does not preclude a court hearing a divorce case in the Family Division from issuing such an injunction in an appropriate case. This court has previously held that "[w]here the claim is related to a subject matter within the responsibility of the division, ... that division may rely upon its general equity powers to adjudicate the claim and to award relief." *Poe,* 525 A.2d at 195 (holding that in "absence of a contrary governing statute or rule, the judge sitting in the Probate Division could entertain a motion for an apportionment of administration expenses and make an award of attorney's fees" and that a separate civil action was not required). Nothing in our law, therefore, prevents a divorce court from exercising its equitable authority to issue an injunction related to the subject matter and parties of the divorce proceedings where the circumstances warrant it. *See* 24 Am.Jur.2d *Divorce* § 326 (1983) (noting that in divorce case "courts may grant a permanent, as well as a temporary, injunction against" harassment but that "trial court exceeds its jurisdiction" by entering a permanent anti-harassment injunction unless there is "evidence demonstrating any equitable basis for such a permanent injunction independent of the [fact of the] marriage relationship of the parties").

I see no reason, moreover, to conclude that the legislature intended to limit the court's equitable power when it provided for issuance of CPOs. *Cf. Zapata v. Zapata,* 499 A.2d 905, 906–09 (D.C.1985) (affirming contempt conviction for violating order prohibiting husband from "interfering in any way, directly or indirectly, with the quiet enjoyment" of property distributed to wife in divorce decree, where husband did not challenge authority of court to enter injunction). Indeed, our cases repeatedly note that the Intrafamily Offenses Act "is a remedial statute and as such should be liberally construed for the benefit of the class it is intended to protect." *Maldonado v. Maldonado,* 631 A.2d 40, 42 (D.C.1993); *accord Cruz–Foster v. Foster,* 597 A.2d 927, 931 (D.C.1991). I am unwilling, therefore, to conclude that the legislature intended the statute governing CPOs to limit the court's inherent equitable authority to issue injunctions, at least in the absence of any statutory language or legislative history manifesting such an intention. *Cf. Cote v. Cote,* 89 Md.App. 729, 599 A.2d 869, 870–73 (1992) (affirming anti-harassment injunction issued by divorce court under its equitable powers, and not under civil protection order statute).

Because the trial court failed to address Mrs. Burwell's request, I am unable to determine whether this case would be an appropriate one for issuance of a permanent no-contact order. I cannot tell whether the trial court credited Mrs. Burwell's testimony that she feared Mr. Burwell and that he had threatened her in his letters because of her actions that led to revocation of his medical parole. The trial court should consider these allegations in the context of Mr. Burwell's history of extreme violence and in light of general principles governing injunctive relief. *See Cruz–Foster,* 597 A.2d at 930–32 (remanding denial of renewal of CPO where court failed to consider past events).

In sum, I disagree with this court's failure to consider the question whether the trial court has the authority to grant the permanent stay-away order Mrs. Burwell requests. I would hold that the court indeed has such authority and thus would remand for the trial court to consider only the limited question whether to exercise that authority in the present case. In all other respects, I join the decision of the court.